Bertram Harnett, J.
Hofstra University, though termed a ‘1 private ’ ’ university, cannot expel, bar and fine a student without following fair and reasonable procedures. It cannot be arbitrary. It must abide by constitutional principles of fair conduct implicit in our society.
Issues surrounding the conduct of college students and their treatment by college officials tend to be emotionally charged. When campus unrest marches apace with an older generation’s discontentment with it, difficulties arise in sifting out legal substance and retaining the long view necessary for social continuance. Many changes have come in legal implication as society has grown and institutions altered, producing overlaps and perspectives unimagined earlier. More narrowly to the point, university character has changed over the years, as have the relationships of people of all ages and kinds to the State and the numerous activities of mixed public and private nature which continually insinuate themselves into our lives.
Here we have Robert Ryan, Jr., accused of throwing rocks through the bookstore window at Hofstra. His is not a civil rights case in the sense contemplated by the Civil Rights Act. And, it does not involve notions of freedom of speech, assembly, or movement. It is the case of a young man accused of vandalism of college property. If he is guilty, he should be punished and the university should have broad discretion to punish him. It would be the university’s duty for the protection of its people and facilities to address itself firmly to his discipline. However, the university too is a creature of the law. The university must abide by legal procedures and respect private rights. If the university is to break the law by violating private rights, it has no superior legal or moral position to one whose law breaking consists of breaking windows.
The problem then is to find justice in a thorny thicket, and so we turn to the case of Robert Ryan, Jr., summarily expelled, barred and fined by Hofstra University. Because of the number and complexity of issues involved, we preface the opinion with this topical table of the points treated:
I. The Facts
A. The Incident and the Immediate Punishment
B. The Hofstra Disciplinary Rules
C. Conduct After Penalty Imposition
II. No Need Here to Exhaust Administrative Remedy
III. Private University Disciplinary Rights are not Limitless
*654 IV. Doctrine of Implied Contract for Discipline not Helpful
V. Hofstra Acted Arbitrarily and Abused its Discretion by
Proceeding Beyond its Own Buies
A. Withholding Choice of Student Judiciary Board
Forum
B. Punishment by Delay
C. Abusive Mode of Discipline
VI. Hofstra’s Procedures are Constitutionally Deficient
A. State Action at Hofstra
1. New York Dormitory Authority
2. Other Governmental Financial Participation
3. A “Private” University?
4. Synthesis
B. Equal Protection of the Laws
C. Due Process of Law
1. Meaning of Due Process
2. Due Process for one Purpose and not Another
3. Due Process was not Afforded Bobert Byan in this Case
VII. Bulings
I. THE FACTS
A. The Incident And the Immediate Punishment
Nineteen-year-old Bobert Byan, Jr. was a Hofstra freshman last semester, and a mover in student protests against tuition increases. He was suspected by the administration of previous violent conduct, although no charges were made and no disciplinary proceedings were had.
On June 10,1971, after the close of his scholastic year, Bobert was apprehended on campus by securty police and accused of throwing a rock through the plate glass display window of the university bookstore that evening. He was taken to the campus security office where, under disputed circumstances, in the sole presence of the campus security chief and the dean of students, he wrote out a confession in which he admitted guilt to three separate rock-throwing incidents.
On June 11, 1971, he was called to face a disciplinary committee of three staff members appointed by the dean. ' According to the testimony of a committee member, he repeated there his *655 guilt to the rock-throwing incidents, although later.in court he recanted his admissions. The committee later also spoke with a school psychologist, and the chief security officer, and apparently considered the statement of a security policeman who claimed to be an eyewitness. It then reported to the dean.
On June 22, 1971, the dean expelled Robert from Hofstra, severing him from the university “ completely and permanently ’ ’. He barred Robert from any part of the campus without his express prior permission under pain of arrest as a trespasser. Finally, he fined Robert and his family $1,011.61 for the ostensible cost of replacing the windows.
At no time prior to his expulsion, barring and fining, was Robert given a choice of procedure, was he represented by any counsel, nor did he have an opportunity to confront any witnesses, nor was he interviewed by any school psychologist or medical personnel.
The dean claims that Robert was guilty of the rock-throwing charges, and that in light of these and the other uncharged incidents he was troublesome and emotionally disturbed. Robert claims he is innocent, that his confession was pressured from him, and that the university is and has been harassing him because of his tuition protest activities.
B. The Hofstra Disciplinary Rules
The Hofstra disciplinary regulations for nonacademic conduct provide that when the dean of students is advised of an incident possibly requiring disciplinary action he may either interview the student himself or refer the matter to a member of his staff. Upon determining that disciplinary hearing is appropriate, the student is given a choice of appearing before either a student judiciary board or members of the dean of students ’ staff.
The dean specified in his testimony that Robert was not given a choice of the student judiciary board, based on that portion of the Hofstra rules which provide that a student “ whose records suggest significant emotional or psychological disturbances which may be relevant ” (Procedure of Disciplinary Action, Step 2, p. 18) will be heard only by the dean’s staff. The dean did not consult any psychologist or psychiatrist before making the disciplinary reference to his staff committee. The testimony was that the staff committee concerned itself with emotional disturbance upon talking with a university psychologist.
There are no rules as to the procedures of the dean’s staff committee except that its members present their recommendations to the dean. The dean must then interview the student *656 and give his decision. There are different provisions where the student judiciary board is chosen, but those are moot here because that forum was neither offered nor convened.
Hofstra’s rules do provide an “ appeal ” procedure for nonacademic disciplinary situations. If the student believes that the dean’s punishment is inappropriate, he may have a hearing by a review committee of five university staff and faculty members and two students upon his petition submitted to the vice-president for student affairs within 10 days after penalty. The vice-president is then supposed to advise the student of his right to call witnesses on his behalf and to confront and cross-examine those who appear against him and of his right to seek counsel, which counsel is limited, however, only to a university staff or faculty member.
The review committee is charged with examining the evidence, hearing witnesses as to the facts and the student’s character, and weighing extenuating- circumstances. The administration, but not the student, has a further right of appeal to the university board of trustees.
C. Conduct After Penalty Imposition
During June, Robert orally requested of the dean and the Hofstra vice-president of student affairs a hearing, but was told that he had to petition in writing. A lawyer representing Robert requested an appeal hearing by letter dated July 9, 1971 to the dean. This letter was returned to the lawyer suggesting that the request be directed to the university vice-president for student affairs. Thereupon, the attorney mailed a similar letter to that official on July 23, 1971 requesting that the review be held prior to the fall semester, but the administration took no action on this.
On August 4, 1971, Robert requested that because of family illness the hearing be delayed until the fall and that he be permitted to attend classes pending the completion of the appeal. This request was turned down by the vice-president for student affairs on August 9, 1971, who volunteered that Robert’s right to petition for a hearing was extended to September 1, 1971. On August 26, 1971, Robert wrote personally to the vice-president for student affairs requesting an appeal. On September 9, 1.971, Robert received a letter (dated Sept. 1) from an assistant president stating there was no more vice-president for student affairs, advising Robert that he would be notified of a hearing date “as soon as practicable”, and directing communication to him.
*657 On September 14, 1971, without any further word from the administration as to review, Robert commenced this proceeding to compel Hofstra to readmit him to classes. On September 16, 1971, classes reopened at Hofstra for the fall season. Sometime after the hearing of this judicial proceeding on September 23, 1971, a review proceeding was first scheduled for October 5,1971.
Essentially, Robert’s contention is that the university’s action was improper and arbitrary and that the proceedings deprived him of due process of law. In reply, Hofstra asserts that Robert has not exhausted his administrative remedies, that the university acted properly, and that Hofstra, as a private institution, was not legally obliged to afford fair process to its students.
II. No Need Here to Exhaust Administrative Remedy
Hofstra first claims that Robert’s action is premature since he has not yet prosecuted his university “ appeal ”. The court rejects this contention.
A major question of the case is the legal adequacy of the determination and review procedures in the first place. If the procedures are fatally defective in law, there is no need to exhaust them. (See Matter of South African Airways v. New York State Div. of Human Rights, 64 Misc 2d 707.)
The law does not require exercises in futility. The authorities in New York are plain that where the end result is apparent, and administrative proceedings are moot, they need not be carried to their technical end. (See Matter of Borders, 34 A D 2d 805.) The expulsion letter of the dean of June 22, 1971 recites the expulsion is ‘1 permanent and complete ’ ’. The university is unyielding that it has no legal limitation on its procedures.
Moreover, the failure to complete the review procedures in the three-month period between the happening of the incident and the bringing of this proceeding results almost entirely from the conduct of Hofstra. Robert did request one delay in early August, but he was turned down. The failure of the administration to consider repeated appeal requests, and the undue technicality which the university applied in approaching even its own rules, preclude any fair application to Robert of the doctrine of exhaustion of administrative remedy. This delay is discussed in detail in section V (B) below.
School has come back into session, the student is barred from attendance, his punishment is being felt every day, and the incident is over four months old. Now is the time for adjudication.
*658 III. Private University Disciplinary Rights are not Limitless
Hofstra argues at the bottom line that since it is a private university it suffers no restriction at all in its disciplining of its students. However one gauges the contemporaneous sensitivity of this attitude, it is plainly not the law. Whatever the application to this case, there are some limits.
The authorities at all levels are consistent that a student may not be arbitrarily expelled from a “private” university. (Matter of Schuyler v. State Univ. of N. Y., 31 A D 2d 273; Matter of Carr v. St. John’s Univ., 17 A D 2d 632, affd. 12 N Y 2d 802; Mitchell v. Long Is. Univ., 62 Misc 2d 733, affd. 35 A D 2d 654; Coleman v. Wagner Coll., 429 F. 2d 1120. See Grossner v. Trustees of Columbia Univ., 287 F. Supp. 535, 549 and 552.) This is so even though the cases have largely sustained expulsions after findings on one theory or another that the university acted properly under the circumstances.
But why is it that a university cannot expel a student arbitrarily'? Three possibilities will be considered: (1) A contract between the university and the student for fair discipline; (2) Statutory article 78 proceedings in New York, the counterpart of the historic common-law writ of mandamus, in which private citizens can compel a ‘ ‘ body or officer ’ ’ acting arbitrarily or in abuse of discretion to do its administrative duty properly; and (3) The Federal and State Constitutions requiring equal protection of the laws and due process of law.
TV". Doctrine of Implied Contract for Discipline not Helpful
The theory of a contract, at least implied, between the university and its students to discipline its students fairly, or in accordance with its specified rules, and not arbitrarily, is found in a number of cases. (Greene v. Howard Univ., 271 F. Supp. 609; Matter of Carr v. St. John’s Univ., supra; Goldstein v. New York Univ., 76 App. Div. 80.) This raises a contractual restraint against unbridled exercise of disciplinary discretion.
However, the theory does not apply to the case at bar since there was no proof here that Hofstra University by catalog or other device notified prospective students or their parents of the disciplinary procedures prior' to, enrollment, nor that disciplinary action was or could be so understood as a contractual term by any of the ostensible parties. Under the testimony here, the rules were first sent to Robert and his parent with his notice of expulsion and fining. No contract was proven or argued by either side.
*659 The contract theory, when applicable, offers the university a major hurdle where, as here, the student is a minor. The imagined contract is not enforceable against the minor (Kaufman v. American Youth Hostels, 13 Misc 2d 8, mod. 6 A D 2d 223, 5 N Y 2d 1016), although by familiar contractual principles, the adult party, the university, could be bound to deal under it. (DeVito v. City of Mechanicville, 251 App. Div. 514.) If a university is to expel a student arbitrarily as a contract right, it meets the legal stalemate of seeking to enforce that legal right against a minor student. If the contract provides rules barring arbitrary action, the university must follow them. In short, the logical extension of the contract theory is that it protects student action (where the student is a minor) and not university action.
But, the principal difficulty with this contract formulation is that it poses a legal fiction of the ilk favored in less enlightened times. No one truly understands that a contract is made as to an unforeseeable future disciplinary involvement. The contractual theory typically assumes in its definition that there is an agreement not to act arbitrarily which is an assumption of the conclusion in the first place. The prohibition of arbitrariness is an intuitive decision of the kind well described by Mr. Justice Hopkins in his recent interesting series ‘1 Public Policy and the Law ” (N. Y. L. J., Aug. 24-26, 1971).
V. Hofstra Acted Arbitrarily and Abused its Discretion by Proceeding Beyond its Own Buies
Private universities, among other bodies, are subject to article 78 of the CPLR. (Matter of Carr v. St. John’s Univ., supra.)
Under CPLR 7803 (subd. 3) a proceeding may test: “ whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed ”. -
This precludes arbitrariness or abuse of discretion by the university in the determination of wrongdoing, as well as the mode of discipline imposed.
Hofstra makes no claim to the- reasonableness of its procedures, its position being that it is a private university unfettered by any community standards. The university’s student code of conduct (nonacademic) page 17, specifically states that university standards may be independent of those established by the greater community and that these standards may apply *660 solely to the university community although they may appear to coincide with civil law.
A. Withholding Choice of Student Judiciary Board Forum
In his testimony, the dean conceded that Hofstra had changed its procedure which had originally vested the disciplinary function directly in the dean alone to include a committee of the staff or the student judiciary board because: “We have seen fit to make it a little less arbitrary ”.
He testified that he gave Robert no choice of appearing before the student judiciary board because of that provision of the rules (Procedure of Disciplinary Action, Step 2, p. 18) requiring staff referral only for “ students whose records suggest significant emotional or psychological disturbance ”. Even though Robert was sent to the staff committee and given no student judiciary board choice because of an assumed record of emotional or psychological disturbance, Robert was at no time interviewed by any medical or psychological personnel, nor were any records produced suggesting the offending disturbance.
Under the adopted rules, Robert was entitled to a. student judiciary board choice unless the record suggested significant emotional disturbance on his part. There was no proof of any such record prior to his referral to the dean’s committee. It was indeed the reverse. It was the staff committee which raised the emotional concern after the student judiciary board choice had already been withheld.
Accordingly, in the absence of a foundation for his conduct, the dean acted arbitrarily and in abuse of discretion in not giving Robert the choice of appearing before a student judiciary board as required by the Hofstra rules.
B. Punishment by Delay
Implicit in the rules must be a requirement for the university to act with reasonable promptness on review applications. The testimony reflects without doubt that the Hofstra administration delayed materially in scheduling a review hearing. Where after oral notification, it had a written notice on July 9, 1971, and subsequent written requests on July 23 and August 26, it first scheduled an appeal hearing on October 5, 1971, three weeks after school reopened. And this scheduling came only after the court hearing in this proceeding.
Given the time necessary to conduct an appeal and reach a reasoned decision, it is apparent that the procedure adopted will necessarily deprive Robert of a semester’s attendance in class, *661 or at best put him under an onerous make-up schedule, if possible, even if he is totally successful on appeal.
This delay works the imposition of a significant penalty which entirely by-passes the review procedure, and must be termed arbitrary and capricious, and abusive of discretion, on the part of the Hofstra administration.
The university’s insistence on a written petition in Robert’s personal hand to the vice-president for student affairs as an excuse for delay is hypertechnical and not legitimate justification. After oral notice from Robert, it rejected the first written communication from his lawyer because it was addressed to the moving and visible dean and not to a certain vice-president, and then rejected the lawyer’s written request to the officer to which it directed him on the ground that Robert personally, not a lawyer, had to write out the request. The administration was fully and fairly informed by the lawyer’s letters of July 9, 1971 to the dean of students and of July 23, 1971 to the vice-president of student affairs. A lawyer acts as a personal representative of his client and for him. The administration’s treatment of this simple request for review smacks of a “ runaround ’ ’. Moreover, if technicality is the order of the day, nothing in the rules precludes petition by a lawyer writing on behalf of a student, unlike the review procedures which specifically limit right to counsel. Amusingly enough, even the administration departed from its insistence on communication with one indispensable officer as the touchstone for its procedure, for in August Hofstra dispensed with its position of vice-president for student affairs altogether. After Robert had personally petitioned that requisite officer, it turned out the office no longer existed, and the university itself requested Robert to communicate with some assistant president. Even then it delayed for six more weeks until October 5, 1971.
C. Abusive Mode of Discipline
While the accused course of conduct amply justified the institution of disciplinary proceedings, even the taking of summary action to forestall possible further harm, the actual disciplinary measures taken when they were, in the opinion of the court, are arbitrary and in abuse of discretion.
As indicated previously, the delay in fixing a review date effectively fixed a significant minimum punishment unaffected by potentially successful appeal.
Moreover, Hofstra, in the first instance, went to the most extreme penalty available to it, total expulsion from the school, *662 “ permanent and complete”. It could have suspended the student, without the greater opprobrium attached to expulsion, and isolated him from the campus, pending a complete determination of the circumstances including his mental condition. Since Robert was in June free for the summer, and three months removed from classes in September, the haste in immediately going the full expulsion route suggests considerations beyond the charged record. No need for full summary action appeared.
Finally, the hasty imposition on Robert and his family of a money fine in excess of $1,000 for three separate incidents, of which only one had a claimed eyewitness, without even submitted proof of damage, was precipitous. The family was not heard at all and in no way signed for any responsibility. A particularly unreasonable part of the skimpy procedure here is that the expelled student cannot get a transcript to enable transfer admission to another school until he pays the fine to the university. Accordingly, a student is put into the position of being» required to pay or prosecute a successful appeal, no matter the time delay, before he can transfer to another school. This financial obligation springs into existence without benefit of counsel or fair hearing.
VI. Hofstra’s Procedures are Constitutionally Deficient
The responsiveness of private universities to constitutional inhibition is a lively current topic. Because of the essential need for academic freedom, a justly careful watch must be kept on outside interference in educational institutions. Yet, the principle of personal right is also an essential need of democratic society. In this competition of principle, a constitutional domino theory is occasionally advanced (see Greene v. Howard Univ., 271 F. Supp. 609, supra) under which any collegiate restriction is viewed as an opening fall which will surely tumble the entire institutional array.
We cannot agree that right of academic freedom requires the total preclusion of personal rights, whether they be of faculty, students, or affected members of the public. Where a ‘ ‘ right ’ ’ can be identified, its force and priority must be measured with the conflicting rights of others. These questions of social balance weave through our whole constitutional texture.
Two constitutional concepts bear down here, one equal protection of the laws, the other due process of law.
Under the Fourteenth Amendment of the Federal Constitution, no State may deny equal protection of its laws. Section 11 of article I of the New York Constitution provides that “ No *663 person shall be denied the equal protection of the laws of this state or any subdivision thereof ’ ’.
Similarly, the Fourteenth Amendment requires that a State, such as New York, shall not deprive rights without due process of law. And section 6 of article I of the New York Constitution reads “No person shall be deprived of life, liberty or property without due process of law ’ ’.
A. State Action at Hofstra
The Federal provisions expressly require that the offending action be State action. The New York Constitution, it is to be noted, differs in formulation. The State constitutional provisions merely require that no person be denied equal protection or be deprived of rights without due process of law, and makes no provision in terms that “State action” be the negating force. However, by virtue of Dorsey v. Stuyvesant Town Corp. (299 N. Y. 512, 531) some State action is prerequisite in New York as well, since the constitutional provisions are “ co-ordinate commands ”.
The law is plain that while State action is the subject of ‘ ‘ equal protection ’ ’ and 1 ‘ due process ’ ’ constitutional limitation, the State itself need not be the direct moving force. The offending action may be taken by a “ private ’ ’ organization, and need not be taken by the State directly or by its elected or appointed officials.
The State action test is set forth in Burton v. Wilmington Parking Auth. (365 U. S. 715, 725) where the United States Supreme Court, in condemning racial exclusion by a private restaurant renting space in a public authority building said: “ The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so ‘ purely private ’ as to fall without the scope of the Fourteenth Amendment ”. To the same general effect, consider the Supreme Court’s statement in Evans v. Newton (382 U. S. 296, 299): “ What is ‘ private ’ action and what is 1 state ’ action is not always easy to determine * * *. Conduct that is formally ‘ private ’ may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action ”.
In his dissenting opinion in Dorsey v. Stuyvesant Town Corp. (supra, p. 542) which is now likely the law by virtue of Burton v. Wilmington Parking Auth. (supra) and subsequent authority, *664 Judge Ftjld wrote: 11 even the conduct of private individuals offends against the constitutional provision if it appears in an activity of public importance and if the State has accorded the transaction either the panoply of its authority or the weight of its power, interest, and support ’
The characterization of governmental standard might be sought in one context and not another. In Grossner v. Trustees of Columbia Univ. (287 F. Supp. 535, supra), the Federal District Court declined in a campus rioting case to enforce constitutional provisions against Columbia University. However, the court explicitly recognized the “ now-settled principle ” that private conduct normally outside the Fourteenth Amendment may be controlled by it when 1 ‘ to some significant extent the State in any of its manifestations has been found to have become involved ”. (p. 546). Indeed the court there said (p. 549): “ It may even be that action in some context or other by such a University as Columbia would be subject to limitations like those confining the State ’ ’.
Society’s administration has become so complex that private organizations are in a position of performing governmental functions and in the discharge of such function may be. subject to the constitutional requirements of using fair and equal procedures. (See Silver v. New York Stock Exch., 373 U. S. 341.) For a thorough and thoughtful study of students ’ rights, see Developments in the Law, Academic Freedom (81 Harv. L. Rev. 1045 [1968]).
1. New York Dormitory Authority
Hofstra has the major State "governmental presence of the New York Dormitory Authority. According to the testimony, over half of the total book value of Hofstra University consists of assets not only constructed but owned by the Dormitory Authority.
Formed under the provisions of the New York Public Authorities Law (§§ 1675 through 1692) the Dormitory Authority constructs dormitories and other buildings for universities, State operated, statutory and contract colleges, as well as other higher educational institutions such as Hofstra. Under the statutes, the State owns the facilities and leases them to universities authorized to confer degrees by the State Board of Regents. This includes Hofstra. The construction money comes from municipal bonds issued by the public authority upon the guarantee of the public authority. The Authority is, of course, tax-exempt.
The Dormitory Authority itself has the power, under section 1678 of the Public Authorities Law to make by-laws for the *665 management and regulation of its affairs, and to maintain and operate its buildings until the cost and the outstanding bonds have been liquidated. Under subdivision 10 of that section, it may rent facilities to private universities and: ‘ ‘ provide by contract for the promulgation [by any private university] of such reasonable and proper rules and regulations as may be necessary to assure the maximum use of the facilities of any dormitory at all times ’ ’.
Under section 1680 of that law, the Dormitory Authority has the same power and authority with respect to dormitories and attendant facilities at private universities that it has relative to its other dormitories. Accordingly, the Dormitory Authority, which is a State public body, has the power to insist upon rules and regulations for the operation of the Hofstra facilities.
The size and dispersion of the Dormitory Authority facilities make it useless to think of Hofstra as a fully functioning university apart from them. They are integral to the university. Nor is this in any way obscure. Signs declaring the Dormitory Authority construction appear conspicuously throughout the university facilities.
The acts complained of in the disciplinary proceeding took place on Dormitory Authority property.
2. Other Governmental Financial Participation
The public participation is not solely measured by the relationship with the Dormitory Authority.
Consider the following additional governmental financial aspects:
(a) Over $1,000,000 of the Hofstra $25,000,000 operating budget comes directly from governmental grants.
(b) The large majority of Hofstra students are New York State residents receiving State scholarship awards and incentives of various amounts under the New York State Education Law. No computation was offered of the exact amount of the Hofstra receipts from State scholarships and incentives.
(c) During the past five years, Hofstra has received over $3,000,000 in direct Federal construction grants.
(d) Hofstra received a donation, conditioned upon educational use, from the Federal Government of 125 acres of land which forms over half its campus.
(e) The total book value of Hofstra is estimated to be $61,000,000, of which $31,500,000 is supplied by the Dormitory Authority. $4,000,000 comes from government grants and $3,500,000 from private gifts, which are largely facilitated by *666 income tax deductions. Only about one third of the Hofstra plant comes from funds generated by Hofstra over the years, presumably through operations. However, it is unknown just how much of this operational surplus stems from prior availability of governmental funding or contract money for governmental services.
(f) The total acreage of Hofstra is 225 acres in the heart of Nassau County, with 1,600,000- square feet of building space. Being a tax-exempt organization, it pays no real estate taxes on its education use properties. Taking judicial notice of the tax rates and assessments in the surrounding area of land and buildings, it is necessary to conclude that a substantial percentage of its total revenues would have to be paid in public real estate taxes if Hofstra were fairly and currently assessed and tax paying.
(g) An Internal Revenue Service Training Center is operated by the Government prominently on campus in a separate leased building. Hofstra also operates a police training program for Nassau County.
3. A “Private ” University?
A key Hofstra contention is that it is exempt from the constitutional provisions cited because it is “ private ”.
But, in what pragmatic sense is Hofstra “ private ”? True, some of its assets are owned by a university corporation and are not in the title of the State or Federal Government. It is a leasing party with the Dormitory Authority. Its payroll is in the name of Hofstra University and not New York State. Its officials and employees are not State elected or appointed and it ha-s its own internal structure.
Yet, “private” connotes ownership or possession by somebody. No private person owns Hofstra University or its property directly, nor even indirectly in the form of shares of stock. The university is replete with public interest, requirement and supervision. The university is in the most real comparable sense a public trust for the rendition of education. It is only for this reason that so much public wealth and effort have been supplied to it.
A private university like Hofstra is an oligarchical form tending to be self-perpetuating. Its fundamental legal responsibilities are to the public. Its existence and favored position can be justified only as a public stewardship.
Hofstra operates under a franchise from the New York State Board of Regents. Under section 219 of the Education Law *667 the Board of Regents can move to dissolve the university corporation if it ceases its educational functions. There would then follow a distribution of its net assets to such educational, religious, benevolent, charitable or similar purposes as the courts might approve. (Education Law, § 220.)
Hofstra’s degree requirements are controlled by the State Board of Regents (Education Law, § 218) and there is State visitation by the Board of Regents. (Education Law, § 215.)
New York State, as a matter of public policy in fulfillment of the governmental function of providing education, has elected to fund both “ public” and “ private ” schools. Through its Board of Regents, it integrates its degree requirements. Its funding is its method of allocating State resources for education, and accordingly publicly implicit in character. (Cf. Simkins v. Moses H. Cove Mem. Hosp., 323 F. 2d 959, cert. den. 376 U. S. 938; cf. Commonwealth of Pennsylvania v. Brown, 270 F. Supp. 782.)
In modern practice, there is a diminishing difference between the actual operation of universities, whether they be “ public ” or ‘ ‘ private ’ ’ in format. While the State university system is under the control of the Governor and the Legislature, it is financing which forms the dominant relationship of the State politic to its own schools. Substantial autonomy is afforded boards and faculties, which abound with private citizens in board positions. To a greater degree, State universities are operating internally free of public political control. (Greene v. Howard Univ., 271 F. Supp. 609, supra.) On the other hand, 1 ‘ private ” universities like Hofstra which are basically financed through State action also have important regulation by the State Board of Regents. And so the two types continually approach a similar reality. The State makes the University fiscally possible. The university’s board of trustees, the faculty, and school administration make the place.
4. Synthesis
The characterization of State action for constitutional purposes rests in part on the particular purpose for which it is sought. Much of the authority for finding State action, or cor-relatively, State inaction, has been in racial discrimination cases, although interesting litigation involving campus disturbance has been presented.
Here the issue is basic to the student involved. His consequence is expulsion, large money fine and a lifetime blot on his record of incalculable harm. The university’s interest in arrest *668 ing nonacademic conduct of the charged type is undeniable. But, the procedures it has adopted are not justifiable and are peripheral to the university’s legitimate objectives. Deprivation of fundamental rights under the equal protection and due process clauses must be accorded high priority in nonacademic circumstances.
The State participation at Hofstra must be a State presence when considering due process and equal protection for nonacademic disciplining of students. Plainly, Hofstra exists as largely a governmental manifestation. The public appearance of the Dormitory Authority is marked by signs. The Dormitory Authority built, owns and leases to it the indivisible bulk of its plant, including the area where the charged vandalism took place. Over one half of its laird stems from Federal donation. State scholarship and incentive funds attach to the majority of its students. It has millions of dollars in government grants and subsidies, not to mention real estate tax exemption which makes its maintenance on its present basis practicable.
Hofstra is franchised by the State, controlled in its degree requirements by the State, and subject to State visitation.
Hofstra is discharging a public function for the State, as part of a State policy of mobilizing higher education resources. In Powe v. Miles (407 F. 2d 73) a private university operating a separate college of ceramics under contract with the State, was held to constitute State action at that college. The court (p. 83) opined that State control remained over a college 11 wholly supported by State money ’ ’. Should the result be different where the physical facility is provided principally by State support, and operating support significantly by the State?
The facts of life of the particular university must be scrutinized .separately for each case. Here we have Hofstra University. In Powe v. Miles (supra), the court refused to find State action at the major portion of Alfred University apart from the college of ceramics. This was because the ceramics school had only one fifth of the Alfred facility, one quarter of the facility, and Federal and State aid was only one or $200,000’ as against a total budget of $6.8 million. The court looked to a test of dominance of support and found it lacking in the case of Alfred University.
Under the Dormitory Authority legislation, the State has the right and ability to insure that Hofstra maintain the rules and regulations employed in the Authority’s other dormitories. This must include physical damage by students to the buildings, means of prevention, and means of redress. The fact that the State elects not to exercise its powers and leaves them with a private party does not remove the State involvement. (Kerr *669 v. Enoch Pratt Free Library, 149 F. 2d 212, cert. den.. 326 U. S. 721; Powe v. Miles, supra.)
Here, as in the Burton, case (365 U. S. 715, supra), the State copld have affirmatively required Hofstra to discharge minimum guarantees of constitutional procedures in nonacademic discipline for offenses against property as a condition of State participation. This could have been done through one or more of the Dormitory Authority grant procedures, legislation regarding scholarship and incentive or tax exemptions, or even prescription of the Board of Regents in franchising, visitorial, or administrative respects. The Supreme Court in Burton points out that no State may effectively abdicate its responsibilities by ignoring them or by failing to discharge them no matter the motive.
The totality of State participation falls within Burton v. Wilmington Parking Auth. ((supra), where it was ruled that private conduct which abridges personal rights violates the equal protection clause where the State in any of its manifestations becomes significantly involved. In Burton, the court stresses that no universal test is possible, but (p. 722): “ only by ¡sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance ’ ’.
B. Equal Protection of the Laws
Given State action, Hofstra students must receive equal protection of the laws. This means that there can be no distinction of legal treatment between Hofstra students themselves, and that Hofstra students must get no less protection of the laws than that the State affords students at other schools of conceded State action, except by legitimite classification.
If the State cannot permit the expulsion and finding of a student without minimum procedural guarantees in the case of a State or tax-supported university, or at a contract school, the State is under an obligation to provide the same protection for students who are attending private universities, entertaining the requisite State presence.
Judge Friendly observed in Coleman v. Wagner Coll. (429 F. 2d 1120) that so far as the student and the public are concerned, there is little difference between Buffalo, Cornell, Columbia and Stony Brook. The State has the power to see that Hofstra students have the same protection of the laws that exist at Buffalo and at Stony Brook and that obligation is owed to the Hofstra students.
*670 Attendance at a tax-supported university is a right subject to constitutional protection, and not an unprotected privilege. (Dixon v. Alabama State Bd. of Educ., 294 F. 2d 150, cert. den. 368 U. S. 930. Cf. Madera v. Board of Educ. of City of N. Y., 386 F. 2d 778.) Accordingly, students at Buffalo and Stony Brook are entitled to constitutional protections and so Hofstra students must also have them.
C. Due Process of Law
1. Meaning of Due Process
Justice Cakdozo’s classic statement is that the deprival must ‘ ‘ violate a 1 principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental ’ ’ ’. (Palko v. Connecticut, 302 U. S. 319, 325.) Another famous formulation of due process is set forth in Pennoyer v. Neff (95 U. S. 714, 733) to the effect that the terms of the Fourteenth Amendment “mean a course of legal proceedings according to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights ’ ’.
It would appear then that due process comes down to a kind of fundamental fairness, measured by tradition and conscience.
Is this not the philosophical root of the prohibition against arbitrariness and abuse of discretion to which a private university and other corporations are held? After all, an individual can be arbitrary. Why cannot a private university be arbitrary? It is simply because there is an inherent aspect of fairness which repels the mind grown accustomed to the protection of personal rights. We live in a society which has justice as one of its firm expectations. This is not to say that article 78 of the CPLR and due process are identical concepts. More likely, article 78 operates in a limited area of due process, requiring officers to do their lawful duty. This is mostly to opine that there is an essential rule of fairness implicit in corporate activity, even though the circumstances of its application may differ between public corporations, quasi-public corporations and so-called private corporations.
2. Due Process For One Purpose and not Another
Due process has no universal thrust under which all fact patterns are to be tested. (See Burton v. Wilmington Parking Auth., 365 U. S. 715, supra.) “ Owing to the very ‘ largeness ’ of government, a multitude of relationships might appear to some *671 to fall within the Amendment’s embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present. Therefore respondents ’ prophecy of nigh universal application of a constitutional precept so peculiarly dependent for its invocation upon appropriate facts fails to take into account1 Differences * * * in law, ’ Whitney v. Tax Comm’n, 309 U. S. 530, 542.” (365 U. S. at pp. 725-726.)
In Dixon v. Alabama State Bd. of Educ. (294 F. 2d 150, 159, supra) the court held a student could not be expelled from a tax-supported university without notice and some opportunity to be heard. In defining “ due process ”, the court emphasized that the nature of the hearing depended on the circumstances of the particular case. It said that “ a full-dress judicial hearing ” is not required, because it is not appropriate to college context, but that the requirements of due process are fulfilled by having ‘ ‘ these rudimentary elements of fair play ’ ’. There must be “ every semblance of fairness ” in school disciplinary procedure. (Due v. Florida Agric. Mechanical Univ., 233 F. Supp. 396, 403.)
Similarly, in Grossner v. Trustees of Columbia Univ. (287 F. Supp. 535, 552, supra), while finding that particular university procedures were entirely fair and amply protective of students’ rights in the incidents charged, the court reminded that the process which is due can vary with the nature of the occasion and the subject.
Due process is then a variable thing. Something different is called for by a criminal trial than a college disciplinary proceeding. But, the constant factor is that the procedure afforded must be traditionally fair and conscionable in the context taken. Due process requirements do not prevent reasonable regulation by universities in disciplining students. While this may permit summary action to prevent situations from getting out of hand (Coleman v. Wagner Coll., 429 F. 2d 1120, 1127, supra) this is because standards of fair play are met in the circumstances.
3. Due Process was not Afforded Robert Ryan in this Case
Testimonial to the pertinency of due process here, ironically, is found in a Hofstra document. In article IV (B), p. 7, Faculty Policy Series No. 12, “ Academic Freedom and Civil Liberties of Students at Hofstra University”, captioned “Due Process in Disciplinary Cases ”, the faculty declares the need for procedural safeguards in academic matters, where, if anything, the fear of external standard should be greater than in non-academic matters, as follows: 1 ‘ But since a student expelled for cheating may find it difficult or impossible to continue his academic career, he should be protected by every procedural safeguard. This *672 is particularly necessary since the courts have rarely granted the student legal review or redress; they have assumed that the academic institution itself is in the best position to judge culpability. This places the college in the unique position of being prosecutor and judge and having at the same time the moral obligation to serve as trustee of the student’s welfare ”.
Bearing in mind that this is a college disciplinary matter, and not a criminal trial (although the acts charged are crimes and admissions taken damaging), it must be observed that Robert’s treatment fell short of the rudimentary requirements of fair play.
Based on the factual discussions above, these departures from due process are troublesome:
(a) Since Robert’s classes had ended for the summer, and his acts, if any, were isolated to him, there appeared no need for the summary expulsion action taken, in absence of a full and fair hearing or time to prepare for one. The hearing on which expulsion was based was had the day after the incident, without reasonable inquiry of Robert’s mental responsibility for his conduct, in view of the administration’s claim of purported emotional or psychological disturbance.
(b) The administration failed to follow its own rules in giving Robert a choice of appearing before the student judiciary board forum.
(c) The administration’s unreasonable delay in affording review proceedings effectively fixed a significant punishment on Robert even were his appeal to be entirely successful.
(d) The assessment of a monetary fine over $1,000 and barring Robert’s procurement of his college transcript for transfer purposes until it is paid was in absence of a fair hearing and opportunity of representation by his own counsel. His family, sought to he fined, was not heard and did not assume his liability, if any.
(e) The Hofstra review procedure is fatally defective in the context of an expulsion proceeding. Choice of counsel limited to persons who are employees of the administration challenged is an undemocratic and unreasonable limitation, not justified by the harm threatened the student. Once a student is summarily expelled, the school cannot argue, as it has, that its procedure is educational and therapeutic for the student, for patently it is not. Proper representation at this point is vital since further administrative review by the board of trustees is only available to the administration, not the student. The student is left, after the initial review, only with recourse to the courts under article 78 of the CPLR if there is no constitutional inhibition. In that case, *673 the court does not try the facts anew, but only upsets the school determination if it is arbitrary on the record. Without free choice of counsel, the student is deprived of a fair opportunity to participate in the production of a fair, totally arm’s length record, and is accordingly necessarily prejudiced in ultimate judicial review, if any. In Madera v. Board of Educ. of City of N. Y. (386 F. 2d 778, supra), while finding due process did not require right of counsel in a school guidance hearing, the court inferred that it would be in an expulsion matter. (Cf. Matter of Goldwyn v. Allen, 54 Misc 2d 94.)
In the collegiate context, the initial nonacademic discipline procedure at Hofstra is not unreasonable, provided it is followed. Since the subsequent appeal or review procedure contemplates an open hearing with witnesses and confrontation, the juxtaposition is not inconsistent with the need to keep order. But when the prescribed procedure is not followed, when punitive delay is set in, and when excessive punishment is summarily dealt, the administration violates the necessary rudiments of fair play.
Once the policy decision is made to give a reasonably inquisitional cast to the initial proceeding, the review mechanism takes on added significance in an expulsion proceeding because it is the student’s total safeguard in the university forum. This makes vital the unfettered choice of counsel by the student. He fights a great disgrace which can be a lifetime burden. This is not a guidance session, nor is there therapy, nor are academic standards involved. The student resists expulsion for grounds in this case which could serve as the basis for a criminal action against him.
The university’s interest in limiting counsel is only administrative and not clear. It is not wholly to bar lawyers, for a lawyer member of the university could act as counsel. There could be no question of guiding or aiding the student, for only academic oblivion awaits him if the administration has its way. He cannot appeal to the university board of trustees. The only colorable administration interests in limiting counsel can be the fear of publicity harmful to it or the student, undue stress on legal technicality, or overly extensive attack on it by a lawyer unfeeling for the administration’s problems. These are not nearly justification to deny free choice of counsel to a student literally fighting for his academic life.
VII. Ruling
Based on the findings and principles set forth above, the action of the Hofstra University dean in expelling Robert Ryan, Jr., *674 barring him from the campus, and fining him and his family will be nullified.
Robert Ryan, Jr. should be immediately reinstated to Hofstra University and given the immediate opportunity to enroll for further study in accordance with his academic attainment under university rules.
Hofstra may reinstitute disciplinary proceedings against Robert for the offenses previously charged, but, in view of the circumstances to date, may not further discipline him on that account except for such finding as may result from the renewed discipline procedure. Nothing in this opinion shall limit the institution of any further or future proceedings against Robert for other instances of misconduct or failure to comply with university rules or standards. Any proceedings will be subject to such modification of the Hofstra rules as provided in this opinion, including without limitation his right to counsel of his own choice in the review of any expulsion determination.