OPINION OF THE COURT
Robert E. Fischer, J.
In this action for libel, defendants have moved on various grounds for summary judgment. With the single exception of the issues raised as to the Statute of Limitations, the facts are not in dispute.
The issues relate to “The Insider’s Guide to the Colleges 1978-79”, which was compiled and edited by the student staff of the defendant Yale Daily News (Yale) and published by defendant Berkley Publishing Corporation (Berkley) . This 404-page paperback publication contains descriptive commentary of 230 colleges and universities throughout the country. Plaintiff, Ithaca College, as one of those *796 institutions, deems certain aspects of an article relating to it to be defamatory. In particular, the college asserts that the following paragraph contains material which damages both its business and academic reputation: “Life at Ithaca is anything but harsh. (Watch out, though. The weather stinks, except in the summer when you’re home.) The Pub, located in the middle of the campus, provides the center of social life for many students. Sex, drugs, and booze are the staples of life. If Ithaca has a reputation as a party school, it is well deserved. The predominant attitude among the upper-middle-class student body is that ‘we are only here to party.’ Sex is casual, and formal dating is unheard of; the pickup scene thrives in Ithaca. The women are reportedly attractive, and the guys weight-trained. The use of pot is a foregone conclusion, and cocaine occasionally manages to wend its way into the hands of those who can afford it. Speed and downers are common, but acid enjoys healthy disuse. The town is cram-packed with bars, theaters, and cultural events.” (Italics supplied.)
The staff of the defendant Yale compiled the data for this seventh edition of the “Insider’s Guide” (the Guide) in 1977, the original publication having been in 1971.
On March 7, 1977, Yale wrote the editor of the school newspaper at Ithaca College, requesting him to recruit two staff members to evaluate the school. The editor was advised that it was difficult for Yale personnel “to visit and evaluate each school personally”, and that its editors “depend heavily on students who can objectively and coherently evaluate their campus”, and furnished guidelines for the proposed evaluation with the letter. In addition to repetitive requests for accuracy and objectivity, as well as comments about the school’s academic life, the reporters were invited to note its social life, viz: “What do people do at your school when they’re having fun? Are drugs popular? How about alcohol? What kind of music do people listen to?” A return date of April 15 was requested.
By letter dated April 25,1977, Yale also requested plaintiff’s admission office to furnish statistical data for its seventh edition ‘to provide up-to-date information for the over 40,000 high school seniors who read the book each year.” A return date of May 8 was requested. The data *797 supplied is contained in the bold-face type preceding the description commentary.
Defendants advise that they edited the copy supplied by the school reporters, but printed the language — here deemed to be defamatory — “almost in haec verba.”
The preface to the book observes that its contents are “apt to excite plenty of disagreement and downright disapproval” and the reader is admonished to “take our words with more than just a polite grain of salt.” The preface further notes — “Unlike other student-written guides to colleges that we’ve seen, we haven’t written this book for students of one lifestyle only. Instead, by providing objective inside information, we hope to help the premed as well as the freak, the jock as well as the future Phibate. A word of caution: We would be the last to say that all of what you read here is gospel. Our correspondents are rarely unanimous. We attempt, by judicious editing, to present all sides, but these efforts seem doomed to failure.” Published in December, 1977, the book bears a January, 1978 (second printing) publication date.
In the fall of 1978, the Vice-President for Student Affairs . of Ithaca College learned of the Guide’s publication “through discussions with students and parents of students attending” the school. His affidavit advises that he had “heard reports from prospective applicants to Ithaca College and their parents questioning the advisability of enrolling at Ithaca College if the statements contained in [the Guide] were true. That it is impossible at the present time to accurately measure how many qualified prospective applicants * * * have been influenced not to enroll * * * by the statements contained [in the Guide].”
By November of 1978, counsel for plaintiff advised defendant Berkley of the statements deemed defamatory,[1] and requested cessation of publication and elimination of the material from subsequent editions to avoid legal action. *798 This proceeding was commenced when defendant failed to respond.
We observe initially that summary judgment is the rule, not the exception in defamation cases (Holy Spirit Assn. for Unification of World Christianity v Harper & Row, Publishers, 101 Misc 2d 30, 34) and the recent imposition of First Amendment privileges on this ancient tort has placed a heavy burden of proof on a plaintiff seeking such relief (see Gertz v Robert Welch, Inc., 418 US 323, 369-388, for Justice White’s historical perspective concerning these competing interests [dissenting opn]). The extent of that burden varies with the public or private character of the one allegedly defamed, private figures being required to prove publication in a “grossly irresponsible manner” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199) while public figures must establish that the statements were made with knowledge of their falsity or with reckless disregard for the truth (James v Gannett Co., 40 NY2d 415, 421). Precedent requires plaintiff to establish the falsity of the libel, at least in the “public figure” area (Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 380) as must a private individual who is the subject of an article “arguably within the sphere of legitimate public concern, which is reasonably related to the matters warranting public exposition” (Chapadeau v Utica Observer-Dispatch, supra, at p 199).
Although we must recognize the nature of those burdens in weighing the merit of summary judgment motions where, as here, the movant is generally the libel defendant, an evidentiary showing must still be made. Thus our search is one for a triable issue of fact, absence of which requires the granting of the motion (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065).
To identify the burden applicable here, we must first determine whether plaintiff — described in the complaint as “an educational corporation, duly chartered under the laws of the State of New York” — is a private or public figure for libel purposes.
The category of “public figures” — which triggers the burdens first articulated in New York Times Co. v Sullivan (376 US 254) — is “of necessity quite broad” and includes *799 those indivduals who must be deemed “public figures for all purposes”, as well as those who might “invite publicity only with respect to a narrow area of interest” (James v Gannett Co., supra, at pp 422-423). Of the same genus are those corporations which, because of their size and influence, are either deemed public figures generally, or deemed so because of actions taken by them which invite public comment (Reliance Ins. Co. v Barron’s, 442 F Supp 1341, 1346-1349). “For the most part those who attain [the] status [of public figures] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.” (Gertz v Robert Welch, Inc., 418 US 323, 345, supra; emphasis supplied.)
It has been observed that private educational institutions, such as the plaintiff, occupy a special place in our society: “ ‘ [T]here has been a general recognition for many generations [in this country] that privately controlled colleges and universities — if they are good — serve the public interest * * * The service [is wide] — including as it does the learning of the faculties, the public value of their libraries, the professional service of the lawyers, doctors and engineers they train, and their general civic meaning as major institutions serving the community as a whole.’ ” (Excerpt from the “Bundy Report”, p 48, quoted in Matter of Canisius Coll. of Buffalo v Nyquist, 36 AD2d 340, 344-345, revd on other grounds 29 NY2d 928.)
As a consequence of their service to the community as a whole, such institutions may be cast in a public role. Indeed, as has been said of another private educational body: “The university is replete with public interest, requirement and supervision. The university is in the most real and comparable sense a public trust for the rendition of education * * * A private university * * * is an oligarchical form tending to be self-perpetuating. Its fundamental legal responsibilities are to the public. Its existence and *800 favored position can be justified only as a public stewardship.” (Matter of Ryan v Hofstra Univ., 67 Misc 2d 651, 666, supplemental opn in 68 Misc 2d 890.)
Though Ithaca College's characterization of itself as a “private liberal arts college” and a “small liberal arts institution” may be apt, such does not eliminate the public aspects of its formation, character and conduct (52 NY Jur, Schools, Colleges and Universities, §§ 755-758). Just as commercial institutions may be deemed public figures “in the general sense” for libel determinants (Reliance Ins. Co. v Barron's, supra), so Ithaca College with its diverse undergraduate enrollment of 2,000 students may be deemed a corporate body no less removed from the public eye or public interest. Assumption of its role as a qualified educator of a large number of students — equivalent in population to each of three of the towns in Tompkins County[2] — precludes the private nature of its claims for libel purposes. It serves the public good, is responsible for fair dealing with its students (Matter of Kwiatkowski v Ithaca Coll., 82 Misc 2d 43; Tedeschi v Wagner Coll., 49 NY2d 652) and is recognized to be of “general fame or notoriety in the community [with] pervasive involvement in the affairs of society” (Gertz v Robert Welch, Inc., supra, at p 352). We cannot view such an institution of higher learning as other than a public figure for all purposes.
Even if we were to assume — for burden purposes — that Ithaca College is not a public figure, it cannot be denied that the nature of its environment and the quality of its education efforts are “arguably within the sphere of legitimate public concern” (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra). It has long played a substantial role in its community and in the educational community at large. By reason of its role it is a proper subject for commentary and analysis; and allegation of fact, although erroneous in content, is minimally subject to the “grossly irresponsible” publication standard of Chapadeau (supra) if not the more rigid malicious or reckless standards of proof required in James v Gannett Co. *801 (40 NY2d 415, supra). In either event, its status has imposed upon plaintiff the difficult burden of defeating this motion by facts which must be established on an evidentiary level in the papers submitted (Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1068, supra).
Addressing the lesser standard of proof articulated above, it is plaintiff’s contention that defendants’ admitted method of compiling data is sufficient to demonstrate “grossly irresponsible” conduct in publishing the claimed libel. We must disagree.
The underlying papers reveal that the student contributors were chosen by the editors of the student newspaper of Ithaca College. A request for objective commentary was included in the suggested guidelines. While the students could have chosen anonymity for their work product, we are advised that their names appear in the list of contributors. Further, plaintiff’s admission office was informed of the intended publication of the current edition and it contributed statistical data for the intended article. Whether its officials had reviewed prior editions of the Guide to ascertain its iconoclastic approach to other respected educational institutions does not appear in the papers submitted.
It thus appears that the defendants gave “due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties” (Chapadeau v Utica Observer-Dispatch, supra, at p 199) for this type of publication and fairly stated its level of knowledge. The jacket of the book states that its source of information is “by students, for students”, and its editors apparently sought the assistance of plaintiff’s student editor — an act that could not fairly be described as grossly irresponsible conduct. That the editor might have chosen contributors whose reported views, separately stated, do not comport with that of other students, or with the plaintiff’s own view of its campus life is, in our opinion, “insufficient to raise a question as to grossly irresponsible conduct” on defendant’s part; rather, in the context of its representations it appears that the student editors of the publication exercised “reasonable methods to insure accuracy” (Chapadeau v Utica Observer-Dispatch, supra, *802 at p 200) for this somewhat tongue-in-cheek statement of its conclusions.
Absent an evidentiary showing by plaintiff on this motion of a fact issue available in the setting of the lesser proof burden, we see no need to pursue at length the potentially greater burden which would be imposed upon it as a public figure. Viewing the publication in the light of the prefatory statements of its limited source and level of knowledge, neither malice nor recklessness can be ascribed. “[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a ‘high degree of awareness of * * * probable falsity.’ ” (Gertz v Robert Welch, Inc., 418 US 323, 332, supra; Roche v Hearst Corp., 72 AD2d 245, 250.) Such an awareness is not here present, and negligence — if present — will not support liability for defamation (Kerwick v Orange County Pub. Div. of Ottaway Newspapers, 72 AD2d 901, 902).
As indicated in its preface, the Guide, at most, “stepped on a goodly number of fingers, a few arms and legs, and in some cases whole torsos.” However, absent any showing or intimation that discovery would alter the basic known facts of compilation and bring about a different result (Holy Spirit Assn. for Unification of World Christianity v Harper & Row, Publishers, 101 Misc 2d 30, 35, supra; Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 384, supra; Trails West v Wolff Publishers, 32 NY2d 207, 221-222), such does not warrant further legal proceedings.
Plaintiff is, of course, entitled to be protected against defamatory statements which affect its credit or property (New York Society For Suppression of Vice v MacFadden Pub., 260 NY 167).
“ ‘A corporation * * * cannot be defamed by words * * * which would affect the purely personal repute of an individual. But it has prestige and standing in the business in which it is engaged, and language which casts an aspersion upon its honesty, credit, efficiency or other business character may be actionable.’ ” (Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation, 75 Col.L Rev 963, 964, quoting Prosser on Torts.)
*803 However, we view the critical commentary as constitutionally protected opinion, rather than fact (Rinaldi v Holt, Rinehart & Winston, supra, at p 381), and such must be assessed in the context of the article as a whole (James v Gannett Co., 40 NY2d 415, 421, supra). Viewed as a student publication to be taken with “more than just a polite grain of salt” as noted in its preface, and seeking to tell college-bound high school seniors what “your counselor won’t tell you” (the Guide, back cover), we do not observe the commentary as defamatory of the college, but rather a somewhat sophomoric appraisal of a segment of its student body. It is apparent that the “sex” and “drugs” attributed to the campus life of the plaintiff are neither unique nor unusual descriptions of campus life in other institutions, and such does not denigrate from the educational offerings of Ithaca College described in the Guide as “good humanities and science offerings”, with an “excellent music school [that] is very professional and demanding.” That the student editors may have overemphasized the social aspects of the college’s life and thereby minimized its virtues and attainments may injure the plaintiff’s pride; and although we recognize the hurt deemed inflicted, the need for free comment concerning such educational institutions must take precedence. Further, lacking any statement or inference that the corporate entity has sanctioned this purported lifestyle of some of its students, we cannot deem the comments to be libel per se of the college, however prospective student applicants and their parents might deem its reputation sullied (El Meson Español v NYM Corp., 521 F2d 737, 739).
While we need not reach the damage issue, we do note the plaintiff’s observation that it does not know how many prospective applicants have been adversely affected by the publication. Since plaintiff is precluded from recovering compensatory damages without proof of injury (i.e., no liability without fault — Gertz v Robert Welch, Inc., 418 US 323, 347, 350, supra) and punitive damages cannot be awarded absent proof of malice or recklessness (Gertz v Robert Welch, Inc., supra, at p 349), plaintiff’s ad damnum clause lacks factual support. Thus, however, one might view the allegedly defamatory material — whether fact or opinion, *804 harmful or innocuous — monetary recovery is not available in view of the imposition of Federal standards on our State jurisprudence (see Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199, supra).
In view of those conclusions, there is no need to address the Statute of Limitations issue. If we were to do so, however, we would find there to be an issue of fact minimally requiring discovery for resolution, if not ultimate trial submission.
The motion for summary judgment is, therefore, granted. Counsel for defendant to submit order. No motion costs.

. The letter also characterized the following quotations from the article as defamatory:
“do expect to be or know the one in three students who will transfer out of IC before graduation.
“However, if you want to party, IC takes 70 percent of those who apply.” The complaint does not allege these comments to be actionable.

. Caroline (2,536), Danby (2,141) and Enfield (2,028) — 1970 Federal Census.