109 N.J. Super. 337 (1970)
263 A.2d 180
R.R., A MINOR, BY HIS GUARDIAN AD LITEM, M.R., PLAINTIFFS,
v.
THE BOARD OF EDUCATION OF THE SHORE REGIONAL HIGH SCHOOL DISTRICT, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided February 27, 1970.
*338 Mr. James F. Henneberry, Jr. appeared for plaintiffs.
Mr. S. Thomas Gagliano appeared for defendant (Messrs. Potter & Gagliano, attorneys).
*339 LANE, J.S.C.
This matter is before the court on the return day of an order to show cause ordering defendant board of education of the Shore Regional High School District to show cause why plaintiff R.R., an infant, who is appearing in this suit through his father M.R. as guardian ad litem, should not be readmitted to his regular classes at the high school and given additional instruction to bring him up to the level of his class. The parties have agreed that the court may treat the matter as if cross-motions for summary judgment had been made.
The essential facts are not in dispute. On January 20, 1970 R.R., aged 15, was a sophomore at the high school which is located in West Long Branch, New Jersey. After his dismissal from the high school at the end of the class day, he went to his home in a neighboring municipality, arriving about 3:30 P.M. Finding the door locked and no one at home, R.R. went across the street to the home of W.O. to see if his parents had left the key to the house there. When R.R. rang the doorbell, L.O., about 15 years old, came to the door and let R.R. in. It is not clear exactly what happened at this point. R.R. alleges that he was provoked into striking L.O. on the back of her head with a piece of wood that he was carrying. He claims that L.O. then picked up a knife and that during the ensuing scuffle in which he tried to get the knife away from her, she was cut in four places. Her version is that R.R. deliberately tried to stab her.
On January 21, 1970 Elbert M. Hoppenstedt, superintendent of the high school, was informed by the principal of the incident. Mr. Hoppenstedt immediately contacted the neighboring municipality's police department and was read a statement of L.O. which set forth her version of the incident. Based on this information and information from the principal and vice-principal of the school that R.R. had been engaged in less serious conflicts with other students (which R.R. denies), it was decided that R.R. should be suspended until the next meeting of the board of education. There was *340 no specification as to such alleged "less serious conflicts." There was no hearing afforded to R.R.
On January 22, 1970 a complaint was signed by a representative of the neighboring municipality's police department against R.R. alleging a violation of N.J.S.A. 2A:90-1. The complaint was forwarded to the Juvenile and Domestic Relations Court on January 29, 1970. A plea of not guilty was entered on February 25, 1970. The matter is now scheduled before that court for a formal hearing on April 9, 1970.
On January 23, 1970 M.R., R.R.'s father, who had been out of the State on business before this date, called the vice-principal of the high school who informed him of R.R.'s suspension from the high school until further notice. The vice-principal told M.R. that the high school would try to get home instruction for R.R. during the period of his suspension. On his own initiative, M.R. had his son examined on January 26, 1970 by Dr. Frank Husserl, a well-qualified psychiatrist. Dr. Husserl requested that R.R. be examined by Dr. Edward Dengrove. This examination was completed but Dr. Dengrove requested an electroencephalograph. As a result of the report of Dr. Dengrove and the report of the electroencephalograph, which was normal, and based on his examination, Dr. Husserl under date of February 6, 1970 addressed a letter:
To Whom It May Concern:
I have examined the above named [R.R.] in my office on January 26, 1970.
It is my professional opinion that he may return to school without risk to the safety and security of others or himself.
On January 27, 1970 the board of education held its monthly agenda meeting. The matter of the suspension was brought to the board's attention by Mr. Hoppenstedt. The board had before it a copy of the statement given by L.O. to the Police. After discussion the board decided that R.R. should continue to remain at home indefinitely pending *341 further investigation and the outcome of his trial. Neither R.R. nor his parents were given notice of this meeting. At no time were they given an opportunity to present their position.
The first written notice of the suspension was received by M.R. in a letter dated January 27, 1970 from the principal of the high school:
In view of the events which have taken place this week involving your son [R.R.], he has been suspended from school until such time as we receive a written report from your doctor about [R.R.] This report will be reviewed and brought to the attention of the Superintendent and the Board of Education for further action. In the meantime, [R.R.] is not to attend school until we notify you that he may return.
While under suspension, [R.R.] may not attend or participate in any school sponsored activities. Enclosed is a statement which you and [R.R.] are to sign indicating he has been abiding by the conditions of his suspension.
Please call me if you have any questions about [R.R.'s] suspension.
After the board of education's agenda meeting on January 27, 1970 the superintendent under date of January 28, 1970 wrote to the parents:
After reviewing all of the facts in the case, the Board of Education has decided that R.R. should continue to remain at home indefinitely pending further investigation and the outcome of his trial. During this period, the Board will furnish R.R. with home instruction in order that he can continue his education without interruption. Mr. Misklow, Guidance Director, will be in touch with you to make arrangements for tutors to come to your home.
We will also want to conduct further testing of R.R. Please arrange to have him in the guidance office on Thursday, February 5th at 10 A.M. for consultation with the school psychologist, Dr. Butler. At a later date we will also make arrangements for R.R. to visit the office of the school psychiatrist.
If you have any questions or wish further information, please call me at 222-9300.
In a telephone conversation on January 28, 1970 the vice-principal told M.R. that this letter superseded the January 27, 1970 letter.
*342 Plaintiffs allege, and it is not disputed, that from the time of the suspension to February 19, 1970, R.R. only received 3 hours and 50 minutes of home instruction. The superintendent in his affidavit seeks to justify that by saying:
I directed Joseph Misklow, Guidance Director, to arrange for home instruction for the boy, which had been approved by the Board. Mr. Misklow experienced great difficulty in obtaining teachers who would give the boy home instruction because the teachers who were asked to give this instruction were unwilling to go to the boy's home unless they could be assured that they would not be subject to any violence. This problem was somewhat complicated because it was our understanding that both of the parents of the boy work and that neither would be home while this instruction was going on.
Significantly, no affidavits are submitted from the teachers who were allegedly asked to provide the home instruction.
In an affidavit dated February 23, 1970 the superintendent states:
According to our Guidance Department, R.R. is now receiving home instruction in all five of his major subjects and if he performs satisfactorily in home instruction, his education will not be jeopardized nor will he be faced with the loss of a school year.
In compliance with the superintendent's letter of January 28, 1970, R.R. was examined by Dr. Butler, the school psychologist on February 5.
On February 18, 1970 without notice to plaintiffs and without affording them a hearing, the board considered the medical reports procured by M.R. and Dr. Butler's report. Dr. Butler's report is referred to in the superintendent's affidavit. The affidavit of the superintendent is equivocal as to whether Dr. Butler was present at the meeting or not. In any event, as to the contents of this report all that is said is:
Dr. Butler's report stated that the boy did have a great deal of "anger" and that this may have originally been caused by his deafness. *343 There is no indication that Dr. Butler said anything about R.R. being a danger to himself, to other people or to school property were he to be readmitted to school.
The board refused to readmit R.R. to school and requested that he be examined by Dr. E. Pustrom, the school psychiatrist. Such appointment was arranged for February 23, 1970 but was subsequently canceled on behalf of plaintiffs. The appointment was canceled on the advice of counsel because the complaint had been filed herein and an order to show cause issued.
The court is informed that the board of education again considered the matter on February 25, 1970 and decided to keep the suspension in effect. No hearing was afforded to R.R.
The question before the court is whether public school officials can deprive a student of his right to attend school because of acts committed off school property and totally unrelated to school activities, and, if so, what procedural due process must the school officials afford to the student.
There can be no doubt that the establishment of an educational program requires rules and regulations necessary for the maintenance of an orderly instructional program and the creation of an educational environment conducive to learning. Such rules and regulations are equally necessary for the protection of public school students, faculty and property. The power of public school officials to expel or suspend a student is a necessary corollary for the enforcement of such rules and the maintenance of a safe and orderly educational environment conducive to learning. But public school officials cannot exercise this power where the activity which is the subject of the proposed suspension or expulsion does not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school. Cf. Burnside v. Byars, 363 F.2d 744 (5 Cir.1966).
*344 In New Jersey public school officials have the authority to suspend or expel students for events happening out of school hours. Palmyra Board of Education v. Hansen, 56 N.J. Super. 567, 571 (Law Div. 1959); N.J.S.A. 18A:37-2. This court is unable to find a New Jersey decision holding that school officials have the right to expel or suspend a pupil for conduct away from school grounds, but the better view is that school authorities have such a right where such is reasonably necessary for the student's physical or emotional safety and well-being, or for reasons relating to the safety and well-being of other students, teachers or public school property. See Annotation, "Right to discipline pupil for conduct away from school grounds", 41 A.L.R. 1312 (1926); Knight v. State Board of Education, 200 F. Supp. 174 (M.D. Tenn. 1961); cf. Stricklin v. Regents of University of Wisconsin, 297 F. Supp. 416 (W.D. Wis. 1969); Marzette v. McPhee, 294 F. Supp. 562, 568 (W.D. Wis. 1968).
Public school authorities have the right to suspend for out-of-school activities in the circumstances stated. The remaining issue is what procedural due process must the school authorities afford to the student.
"It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens." Dixon v. Alabama State Board of Education, 294 F. 2d 150, 157 (5 Cir.1961), cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).
There can be no doubt that such is the policy of the State of New Jersey. The New Jersey Constitution (1947), Art. VIII, § IV, par. 1, provides:
The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.
*345 The Legislature has fulfilled this constitutional mandate by the enactment of Title 18A of N.J.S.A.N.J.S.A. 18A:38-25 requires compulsory education. Pingry Corp. v. Hillside Tp., 46 N.J. 457, 461 (1966).
In State v. Vaughn, 44 N.J. 142 (1965), Justice Schettino stated:
The education of a child has always been of supreme importance and an ideal which has long been required in our state. [at 145]
N.J.S.A. 18A:37-1 et seq., deals with the discipline of pupils in the public schools. N.J.S.A. 18A:37-4 provides:
The teacher in a school having but one teacher or the principal in all other cases may suspend any pupil from school for good cause but such suspension shall be reported forthwith by the teacher or principal so doing to the superintendent of schools of the district if there be one. The superintendent to whom a suspension is reported or if there be no superintendent in the district, the teacher or principal suspending the pupil shall report the suspension to the board of education of the district at its next regular meeting. Such teacher, principal or superintendent may reinstate the pupil prior to the second regular meeting of the board of education of the district held after such suspension unless the board shall reinstate the pupil at such first regular meeting.
N.J.S.A. 18A:37-5 provides:
No suspension of a pupil by a teacher or a principal shall be continued longer than the second regular meeting of the board of education of the district after such suspension unless the same is continued by action of the board, and the power to reinstate, continue any suspension reported to it or expel a pupil shall be vested in each board.
It is a basic principle of law that there is a strong presumption that a statute is constitutional. A legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. Gangemi v. Berry, 25 N.J. 1, 10 (1957); In re Loch Arbour, 25 N.J. 258, 264-265 (1957). It is the duty of the judiciary to sustain the legislative will if at all possible, piercing through *346 the gloss to the substance of the statute. Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 223 (1960). Legislation will be so construed as to sustain its validity. Masters-Jersey, Inc. v. Paramus, 32 N.J. 296, 301 (1960). Where a statute is reasonably open to a constitutional construction it should be so read, State v. Hudson County News Co., 35 N.J. 284, 294 (1961), taking into consideration whether the Legislature would want the statute to succumb or survive constitutional attack. Schmoll v. Creecy, 54 N.J. 194, 202 (1969). In construing a statute the presumption is that the Legislature acted with existing constitutional law in mind and intended to function in a constitutional manner, and the provisions that insure compliance with the Federal or State constitutions need not be specifically spelled out with particularity, but may arise by inference. Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108, 113 (1968).
The action taken by the Shore Regional High School officials meets the literal requirements of N.J.S.A. 18A:37-4 and N.J.S.A. 18A:37-5, but literal compliance without more violates R.R.'s constitutional rights to due process of law.
It is generally recognized that with respect to discipline of students in public educational institutions, involving the possible imposition of serious sanction such as suspension or expulsion, the requirements of procedural due process under the Fourteenth Amendment are applicable. Woods v. Wright, 334 F. 2d 369 (5 Cir.1964); Dixon v. Alabama State Bd. of Educ. 294 F.2d 150 (5 Cir.1961), cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Marzette v. McPhee, 294 F. Supp. 562 (W.D. Wis. 1968); Moore v. Student Affairs Comm. of Troy State Univ., 284 F. Supp. 725 (M.D. Ala. 1968); Schiff v. Hannah, 282 F. Supp. 381 (W.D. Mich. 1966) (en banc); Esteban v. Central Mo. State College, 277 F. Supp. 649 (W.D. Mo. 1967); Knight v. State Bd. of Educ. 200 F. Supp. 174 (M.D. Tenn. 1961); Annotation, "Right of student to hearing on charges before *347 suspension or expulsion from educational institution," 58 A.L.R.2d 903 (1958); "Developments in the law  Academic Freedom," 81 Harv. L. Rev. 1045, 1134-1143 (1968); Seavey, "Dismissal of Students: `Due Process,'" 70 Harv. L. Rev. 1406 (1957). These procedural due process requirements are applicable to a student attending a public high school. Kelly v. Metropolitan County Bd. of Ed. of Nashville, etc., 293 F. Supp. 485 (M.D. Tenn. 1968).
N.J.S.A. 18A:37-2, N.J.S.A. 18A:37-4 and N.J.S.A. 18A:37-5 must, therefore, be construed to require public school officials to afford students facing disciplinary action involving the possible imposition of serious sanctions, such as suspension or expulsion, the procedural due process guaranteed by the Fourteenth Amendment.
Where public school officials have reasonable cause to believe that a student, by virtue of activities after school hours and off school property, presents a danger to himself, to others or to school property, they may temporarily suspend the student for a short period of time pending a full hearing which will afford such student procedural due process. They must, however, under ordinary circumstances afford the student a preliminary hearing.
In Stricklin v. Regents of University of Wisconsin, 297 F. Supp. 416 (W.D. Wis. 1969), it is held that a preliminary hearing is required prior to the imposition of an interim suspension and before the full hearing on the ultimate issue of suspension or expulsion except in exceptional cases. The court stated:
When the appropriate university authority has reasonable cause to believe that danger will be present if a student is permitted to remain on the campus pending a decision following a full hearing, an interim suspension may be imposed. But the question persists whether such an interim suspension may be imposed without a prior `preliminary hearing' of any kind. The constitutional answer is inescapable. An interim suspension may not be imposed without a prior preliminary hearing, unless it can be shown that it is impossible or unreasonably difficult to accord it prior to an interim suspension. Moreover, even when it is impossible or unreasonably difficult to *348 accord the student a preliminary hearing prior to an interim suspension, procedural due process requires that he be provided such a preliminary hearing at the earliest practical time. [at 420-421]
The preliminary hearing may be completely informal. The student should be given the opportunity to persuade the authority that there is a case of mistaken identity or that there is some other compelling reason why he should not be suspended pending a full hearing.
The nature of the full hearing clearly depends upon the circumstances of the particular case. See Madera v. Board of Education of City of New York, 386 F.2d 778 (2 Cir.1967), cert. den. 390 U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968); Scott v. Alabama State Board of Education, 300 F. Supp. 163 (M.D. Ala. 1969); Stricklin v. Regents of University of Wisconsin; 297 F. Supp. 416 (W.D. Wis. 1969); Marzette v. McPhee, 294 F. Supp. 562 (W.D. Wis. 1968); Kelley v. Metropolitan County Bd. of Ed. of Nashville, etc., 293 F. Supp. 485 (M.D. Tenn. 1968); Schiff v. Hannah, 282 F. Supp. 381 (W.D. Mich. 1966); Wright v. Texas Southern University, 277 F. Supp. 110 (S.D. Texas 1967), aff'd 392 F.2d 728 (5 Cir. 1968); Knight v. State Board of Education, 200 F. Supp. 174 (M.D. Tenn. 1961); Annotation, "Right of student to hearing on charges before suspension or expulsion from educational institution," 58 A.L.R.2d 903 (1958); Van Alstyne, "The Student as University Resident," 45 Denver L.J. 582, 593-594 (Special 1968); Note, "Developments in the Law-Academic Freedom," 81 Harv. L. Rev. 1045, 1134-1143 (1968).
In Dixon v. Alabama State Board of Education, supra, where the court held public school officials must at least exercise fundamental principles of fairness by giving the student subject to dismissal or expulsion notice of the charges and an opportunity to be heard in his own defense, the Court stated:
*349 For the guidance of the parties in the event of further proceedings, we state our views on the nature of the notice and hearing required by due process prior to expulsion from a state college or university. They should, we think, comply with the following standards. The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled. [at 294 F.2d, at 158-159]
This quotation sets forth the minimum requirements for the hearing. The student may, but need not be, represented by counsel. See Case Comment: "Constitutional Law  Due Process Does Not Require That A Student Be Afforded The Right To Counsel At A Public School Suspension Hearing," 22 Rutgers L. Rev. 342 (1968). The title of this comment is misleading. The comment argues that there should be a right to employ counsel. This court agrees with the author.
The right to such a hearing has been recognized by the Commissioner of Education of New Jersey. See Scher v. Board *350 of Education, West Orange (N.J. School Law Decisions, January 1 to December 31, 1968, at 92).
From the circumstances of this case as presented in the affidavits before the court, if the school officials had reasonable cause to believe R.R. was a danger to himself, to others or to school property by virtue of his after hours off school property conduct the school officials could have suspended him after affording him a preliminary hearing. At the preliminary hearing he could have asserted a case of mistaken identity, extreme provocation, or other compelling justification for withholding the proposed interim suspension. If after this preliminary hearing the school officials had reasonable cause to believe R.R. was a danger to himself, others or school property, he could be suspended but was entitled to a full hearing affording him procedural due process within a short period of time, no more than 21 days. As noted in Dixon, supra, this hearing will vary with the circumstances of each case.
Since his suspension on January 23, 1970 R.R. had not been given either a preliminary hearing or a full hearing. Under the circumstances defendant will be ordered to readmit R.R. to the high school Monday morning, the next school day, and to afford him extra instruction so that he can catch up with his class. The readmission of R.R. will be conditioned upon his submitting to an examination by Dr. Pustrom within ten days.
Should the school officials have reasonable cause to feel that after R.R.'s readmission he has given evidence that he is a danger to himself, to others or to school property, they would be at liberty to suspend him after a preliminary hearing. If it is impossible or unreasonably difficult to accord such preliminary hearing prior to an interim suspension, it should be conducted at the earliest practical time after the imposition of the interim suspension. Of course, should such interim suspension occur, R.R. would be entitled to a full hearing as mandated by Dixon, supra. The full hearing should take place not more than 21 days from the suspension.