730 A.2d 365 (1999)
322 N.J. Super. 1
Marcus HERNANDEZ, individually and by his Guardian ad litem Peter Hernandez, Peter Hernandez, and Emily Hernandez, Plaintiffs-Respondents,
v.
DON BOSCO PREPARATORY HIGH, Charles O'Sullivan, Father John Grinsell, and James M. Scanlon, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 1999.
Decided June 8, 1999.
*366 Dennis Calo, Hackensack, for defendants-appellants (Calo & Agostino, attorneys; Mr. Calo, on the brief).
Leonard S. Miller, Fair Lawn, for plaintiffs-respondents (Lisa A. Buckalew, New Brunswick, on the brief).
Before Judges PRESSLER, KLEINER, and STEINBERG.
The opinion of the court was delivered by *367 KLEINER, J.A.D.
Defendant[1] Don Bosco Preparatory High ("Don Bosco"), a private Catholic high school, filed a motion for leave to appeal an order denying its motion for summary judgment.[2] Because this is an issue of first impression in New Jersey, we granted leave to appeal the interlocutory order.
The sole issue on appeal is whether Don Bosco adhered to procedural safeguards when it expelled one of its students, plaintiff Marcus Hernandez ("Marc"). New Jersey courts have previously addressed the procedural rights of expelled students at public high schools and at private universities, and the rights of expelled members of private associations. Until now, no court in this State has considered, in a reported decision, the procedural rights of an expelled student at a private high school. We now hold that a private high school, when dismissing a student for misconduct, must follow its own established procedures for expulsion, and in so doing must follow a procedure that is fundamentally fair. Because we are satisfied that Don Bosco followed a fundamentally fair procedure when it expelled Marc, we reverse the order denying Don Bosco's motion for summary judgment.

I
Plaintiff Marc Hernandez was a student at Don Bosco, a private Roman Catholic boys school in Ramsey, New Jersey. Plaintiff began his schooling at Don Bosco as a freshman in 1991. Plaintiff was an average student and a member of the wrestling team. During his freshman and sophomore years, he received a few minor disciplinary detentions.[3] During his junior year, he received five detentions for misconduct.
During the summer of 1994 following Marc's junior year, the Assistant Principal, Charles O'Sullivan, sent a letter dated July 12, 1994, to Marc and his parents, Peter and Emily Hernandez. The letter informed the Hernandez family that, as a result of Marc's detentions during his junior year, Don Bosco was placing Marc on disciplinary probation for the fall semester of his senior year. The letter noted that "[a] continuance of minor incidents would mean that he may not be allowed to return to Don Bosco for the following school year." Marc and his parents signed the letter and sent a signed copy back to the school. Although not required, Marc's parents met with O'Sullivan after receiving the letter of probation, at which time O'Sullivan reviewed the list of detentions, but assured the Hernandez family that they should not worry.
During the fall semester of Marc's senior year, while on probation, Marc was involved in an argument on a school bus with a freshman, James Hopper. After the incident, O'Sullivan called Mrs. Hernandez for a meeting. Thereafter, Marc was suspended for one day as a result of the argument with Hopper.
In February of Marc's senior year, after the probationary period ended, O'Sullivan summoned Marc from class on several occasions *368 to question him about the "trashing" of a teacher's house, the slashing of that teacher's automobile tires, and about prank phone calls made to the same teacher. Defendant contends that fellow students reported to O'Sullivan that Marc was bragging about prank calling the teacher. Plaintiff initially denied any involvement in either the prank calls or the trashing of the teacher's home. Thereafter, Marc told O'Sullivan that another student, Brad Levy, had called Marc and the teacher on a conference call, but did not inform Marc what he was doing. Marc received an in-school suspension on February 16, 1995, as punishment for his involvement in the conference call. O'Sullivan called Mr. Hernandez to inform him of Marc's in-school suspension, and requested a meeting with Marc's parents. On February 27, 1995, Mr. and Mrs. Hernandez met with O'Sullivan. They presented a phone bill indicating that Marc had been on a long-distance phone call with his girlfriend on the night the teacher's home and car were trashed. They also brought to the conference Marc's Swiss army knife under the belief that such evidence would prove that Marc was not involved in the tire slashing, as the perpetrator's knife had been confiscated by the police.
During this same time period, Brad Leveythe student who had called Marc and the teacher on a conference callreported to O'Sullivan that Marc was using and selling illegal steroids to other students on school grounds. Brad Levy also reported that Marc had been bragging about urinating in students' lockers. Another student, Mike Sack, corroborated Brad Levy's report about Marc's use and distribution of steroids. As a result of this information, O'Sullivan called a meeting with Marc and his parents on March 2, 1995. Defendant contends that during the March 2 meeting, Mike Sack was present and described the incident when Marc offered to sell him steroids. Plaintiff argues that he and his parents were not informed as to the nature of this meeting, and were "ambushed" at this meeting with accusations of steroid use and distribution. During the meeting, Mrs. Hernandez admitted that she had found steroids in Marc's bedroom prior to the meeting. Marc told O'Sullivan that the bottle of legal steroids that his mother found in his bedroom were purchased at a health food store by Marc's friend who had mistakenly left the bottle in Marc's room. At the end of the meeting on March 2, O'Sullivan told the Hernandez family that Marc was being placed on indefinite suspension.
Thereafter, O'Sullivan met with the Disciplinary Committee and reviewed Marc's disciplinary history. O'Sullivan recommended to the Committee that Marc be dismissed; the Committee agreed. O'Sullivan also met with Father Grinsell, the Director of Don Bosco, who also agreed that Marc should be dismissed.
Meanwhile, Marc wrote a letter of appeal to Father Grinsell dated March 6, 1995. Marc also took a polygraph test and drug test, which indicated that Marc was telling the truth and was drug free.
On March 9, 1995, O'Sullivan and James Scanlon, the Principal at Don Bosco, met with Marc and his parents. O'Sullivan and Scanlon asked Marc to withdraw from Don Bosco. Plaintiff contends that he requested a hearing to determine the nature of the charges against him and the grounds for dismissal; his request was denied. Thereafter, plaintiff wrote letters of appeal to Father Timothy Ploch, the Provincial Director, and again to Father Grinsell. Father Grinsell met again with O'Sullivan and met with Principal Scanlon, and agreed that Marc should withdraw. Father Grinsell denied Marc's appeal. Marc's attorney allegedly sent a letter, received on March 10, threatening legal action if Don Bosco failed to reinstate Marc.
Marc did not withdraw from Don Bosco. As a result, Principal Scanlon wrote a letter dated March 16, 1995, informing the Hernandez family that Marc was dismissed from Don Bosco. The letter indicated *369 that after the meeting with the Hernandez family on March 9, when Marc was asked to withdraw, Principal Scanlon personally consulted with Father Grinsell and decided to dismiss Marc. The letter reviewed Marc's disciplinary history: the probation during the fall term of Marc's senior year; the incident on the bus with James Hopper which led to a suspension; the allegations of prank calls to the teacher which also resulted in a suspension; the report of steroid use and distribution; and the report of urinating in students' lockers. The letter also reviewed the meetings in March preceding the decision to dismiss Marc. The letter noted that Marc had sent letters to Father Grinsell, who denied his appeal. The letter concluded that "Marc had been given more than a fair opportunity to conform his conduct to the requirements of our school. Marc had fair notice of these requirements, both from the Parent/Student Handbook and from the numerous warnings and lesser punishments he has received." The letter cited relevant portions of the Student & Parent Handbook. The letter concluded that for all the reasons stated in the letter, Principal Scanlon "reached the decision to dismiss Marc."[4]
Don Bosco prepares a Student & Parent Handbook for each academic year. The students and the parents are required to read the handbook and sign the "contractual agreement" at the commencement of the school year. The handbook for the academic year 1994-95 (Marc's senior year) includes a provision for discipline, in which Don Bosco reserves the right:
to suspend and, when circumstances warrant, to dismiss students whose behavior is disrespectful, recalcitrant, disruptive, immoral, illegal or which is at odds with promoting our school environment or is detrimental to the reputation of the school with regard to behavior occurring inside or outside of the school.
Additionally, students who are:
disruptive in class, uncivil in the cafeteria or rude and insulting at athletic contests are in serious violation of the proper code of conduct, and depending on the gravity and frequency of the offense the student will be detained after school, suspended for a suitable period, or, at the discretion of the Principal, dismissed from Don Bosco Preparatory.
The Principal may place a student on disciplinary probation[5] for committing a "serious infraction," but only after hearing the recommendations of the Discipline Committee. The terms of probation are presented to the parents, and the parents and the student must sign the agreement. While on probation, if the student is involved in another major infraction, the student may be dismissed at once.
Dismissal at Don Bosco is reserved for a "serious offense against Christian morality at school or school event," or for a violation of disciplinary probation. The Principal must consult with the Director of the Don Bosco School Board. The student may appeal in writing to the Director.
The Discipline Committee's purpose is "to consider and suggest the most appropriate course of action to be taken regarding a student who has committed a grave offense against the civil or moral law in school or at a school function." The Committee consists of the Assistant Principal (O'Sullivan), the Class Dean, and the student's *370 Guidance Counselor in an advisory, non-voting capacity. The Principal (Scanlon), though not a member of the Committee, may be present during the meeting. The Committee must meet before any student is dismissed for disciplinary reasons. The Committee makes a recommendation to the Principal, who in turn makes the final decision as to the student's dismissal after consulting with the Director (Father Grinsell).
The handbook specifically prohibits harassment in any form. The handbook also states that "possession, use, sale, or distribution of alcohol or drugs, whether legal or illegal, before, during, or after the school day or at or before any school function will be handled by the Ramsey Police Department and is grounds for dismissal from Don Bosco Preparatory."

II
Plaintiff filed a complaint alleging improper dismissal that prevented him from securing scholarships and admission to certain colleges. At the oral argument for Don Bosco's motion for summary judgment, the motion judge stated that he could not find in his "review of the case law any finite position taken by the courts of this State that says conclusively that a private school is immune from providing procedural due process, and I refuse to take that position." The motion judge concluded that both constitutional due process and basic fairness require a hearing and notice of charges. The judge further concluded that the facts alleged required a jury to determine whether the school followed its own procedure that it had set forth in the handbook. The judge also determined that neither party had demonstrated facts to warrant summary judgment. The judge noted plaintiff's argument that the school should have called the Ramsey police but failed to do so, but that the judge did not "know what the evidence is going to be with respect to that." Accordingly, the court denied Don Bosco's motion for summary judgment.
On appeal, Don Bosco argues that plaintiff's entire case was appropriate for summary judgment, that its actions as a private school did not implicate the New Jersey or United States Constitution, and that Don Bosco complied with sufficient procedure in dismissing Marc. We agree.

III

A. CONSTITUTIONAL CLAIMS
Plaintiff alleged violations of due process, which would include a claim for the violation of due process under the United States Constitution and the New Jersey Constitution. The United States Constitution provides that no state may deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. The New Jersey Constitution provides:
All persons are by nature free and independent and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
[N.J. Const. art. I, ¶ 1.]
We first address plaintiff's federal constitutional argument. Plaintiff must demonstrate that Don Bosco functioned as state action to invoke federal constitutional protection. Private schools are only bound to the constitutional requirements of due process if the private school has substantial involvement with the state. Courts have recognized that "[c]onduct that is formally `private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373, 376 (1966); see also Burton v. Wilmington Parking Auth., 365 U.S. 715, 726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45, 52-53 (1961) (finding state action for *371 Equal Protection claims in a restaurant which leased the building from a State).
New Jersey courts have addressed the issue of state action in private universities. State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980), app. dismissed, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), addressed the First Amendment in private schools:
A private college or university, however, stands upon a different footing in relationship to the state. Such an institution is not the creature or instrument of state government. Even though such an institution may conduct itself identically to its state-operated counterparts and, in terms of educational purposes and activities, may be virtually indistinguishable from a public institution, see McKay, "The Student As Private Citizen," 45 Denver L.J. 558, 560 (1968), a private college or university does not thereby either operate under or exercise the authority of state government. Hence, the state nexus requirement that triggers the application of the First Amendment is not readily met in the case of a private educational institution.
[Id. at 543, 423 A.2d 615.]
Further, the Court in Schmid stated that:
Among the factors most often marshaled to show state action [for First Amendment purposes] are that the institution received government funds, that the institution was performing a governmental function by providing education, that it was state-accredited or state-chartered or was otherwise highly regulated by the state, that the college derived economic benefit from tax exemptions, that it indirectly enforced governmental laws, or, in some instances, that the college had been built on formerly public lands.... For the most part, however, such challenges have failed.
[Id. at 545-46, 423 A.2d 615 (citations omitted).]
Thus, in Schmid, the Court determined that despite the nexus between the State of New Jersey and Princeton University, i.e., state accreditation, participation in state programs, tax-exempt status, and some state funds, the university was wholly private and its actions did not rise to the level of state action for First Amendment purposes. Id. at 547-48, 423 A.2d 615.
Here, both parties cite Napolitano v. Princeton Univ. Trustees, 186 N.J.Super. 548, 453 A.2d 263 (App.Div.1982), where we noted that courts "have been virtually unanimous in rejecting students' claims for due process in the constitutional sense where academic suspensions or dismissal are involved." Id. at 567, 453 A.2d 263 (citations omitted); see also Huff v. Notre Dame High School, 456 F.Supp. 1145, 1148 (D.Conn.1978) (noting that the federal judiciary is "nearly unanimous in holding that financial assistance to a private university or professional school, without more, does not render the actions of the educational institution state action for purposes of [a claim under § 1983]").
Plaintiff relies on Ryan v. Hofstra Univ., 67 Misc.2d 651, 324 N.Y.S.2d 964 (N.Y.Sup.Ct.1971). There, the plaintiff was a college student at Hofstra University, a private college in New York. Plaintiff was expelled from the university after a student protest during which he threw rocks. The trial judge determined that the state was significantly involved in Hofstra University so as to render the school an agent of the state. Id. at 983. The judge held that plaintiff was deprived of due process in his expulsion.
However, in a subsequent opinion by another New York trial court, the judge declined to apply the holding in Ryan to a private high school. Oefelein v. Monsignor Farrell High School, 77 Misc.2d 417, 353 N.Y.S.2d 674 (N.Y.Sup.Ct.1974). In Oefelein, the plaintiff was a private high school student and was expelled without a hearing. The opinion does not disclose the reason for the expulsion. The plaintiff there listed the nexus between the high school and the state: state charter, state regents exams, tax-exempt status, secular books supplied by the state, and attendance *372 requirements. Id. at 675. The plaintiff in Oefelein also relied on Ryan, supra, 67 Misc.2d 651, 324 N.Y.S.2d 964. However, the court distinguished the facts in Oefelein from those in Ryan. First, the court determined that the nexus that the high school had with the state was substantially less than Hofstra University. Second, the rights of a high school student are different than those of a college student. "A high school student has immediate access to the public schools to complete his [or her] education. A college student may not be able to transfer so easily." Oefelein, supra, 353 N.Y.S.2d at 675. Accordingly, the expulsion was not a state action, and thus the student had no constitutional rights of due process. The issue of whether the school dealt fairly with the student was not before that court. Id. at 676; see also Wisch v. Sanford School, 420 F.Supp. 1310, 1313-14 (D.Del.1976) (finding that a private high school's tax-exempt status and state funds for student transportation and for driver's education was insufficient state involvement to invoke constitutional due process).
Don Bosco was clearly acting as a private organization, not as a state agency. Plaintiff alleges only that the State of New Jersey funds and aids in the operation of the school through accreditation. Such a negligible connection with the State is plainly insufficient to render the school's dismissal "state action" under the requirements of the United States Constitution. Thus, federal due process was not warranted for Marc's dismissal.
Although plaintiff's claim for violations of due process fails under the United States Constitution for lack of state action, plaintiff also includes a due process claim under the New Jersey Constitution. "The New Jersey Supreme Court has continued to consider interpretations of the state constitutional rights provisions that are broader, or more protective of citizens, than the decisions of the United States Supreme Court interpreting the federal Constitution." Robert F. Williams, The New Jersey State Constitution: A Reference Guide xix (1997). For example, in Schmid, supra, 84 N.J. at 560, 423 A.2d 615 the Court dismissed plaintiff's First Amendment claim but granted relief under the New Jersey Constitution. See, e.g., State v. Mollica, 114 N.J. 329, 352, 554 A.2d 1315 (1989) (giving greater protection of privacy interest in toll records for telephone use); State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987) (allowing more protection from unreasonable searches and seizures); Right to Choose v. Byrne, 91 N.J. 287, 310, 450 A.2d 925 (1982) (giving a greater right to abortions under Medicaid than the opinion in Harris v. McRae, 448 U.S. 297, 316, 100 S.Ct. 2671, 2687-88, 65 L.Ed.2d 784, 804 (1980)); State v. Baker, 81 N.J. 99, 405 A.2d 368 (1979) (holding that a municipality may not pass a zoning ordinance limiting the number of non-related individuals living in a single household unit); State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975) (giving more rights to a person being searched in New Jersey than required by the decision in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). See generally Williams, supra, The New Jersey State Constitution: A Reference Guide at 27-28; William J. Brennan, Jr., "State Constitutions and the Protection of Individual Rights," 90 Harv. L.Rev. 489 (1977). We refused to read article one, paragraph one of the New Jersey Constitution as granting greater rights than the Fifth or Fourteenth Amendments to the United States Constitution in Ferraro v. Long Branch, 314 N.J.Super. 268, 286, 714 A.2d 945 (App.Div.), certif. denied, 157 N.J. 541, 724 A.2d 801 (1998).
Although the New Jersey Constitution does, in certain situations, grant greater protection to individual rights than the United States Constitution, we can not conclude that our State Constitution grants greater protections in the area of procedural due process for expulsion from a private school. Accordingly, because of the absence of state action, neither the *373 United States Constitution nor the New Jersey Constitution protect plaintiff's procedural rights. We therefore dismiss plaintiff's constitutional claims.

B. FUNDAMENTAL FAIRNESS
Although plaintiff can not show state action to invoke the protections of the Fourteenth Amendment or article I of the New Jersey Constitution, we now consider what procedural protections a private high school must afford its students upon disciplinary expulsion. In our analysis, we consider public schools and universities, private associations, private universities, and private primary and secondary schools.
Public high school students enjoy the greatest procedural rights when expelled because of procedural due process protection. The United States Supreme Court has held that, in the public school arena, "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause." Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725, 734 (1975). The minimum requirements for temporary suspension for misconduct include "oral or written notice of the charges against [the student] and, if he [or she] denies them, an explanation of the evidence the authorities have and an opportunity to present his [or her] side of the story." Id. at 581, 95 S.Ct. at 740, 42 L.Ed.2d at 739. The school need not give notice of the charges in advance of the hearing, so long as the student is informed of "what he [or she] is accused of doing and what the basis of the accusation is." Id. at 582, 95 S.Ct. at 740, 42 L.Ed.2d at 739. The Court declined to hold that the student has the right to obtain counsel, to confront and cross-examine adverse witnesses, or to call witnesses in defense. Id. at 583, 95 S.Ct. at 740, 42 L.Ed.2d at 740. However, the Court noted that permanent expulsion may require a more formal procedure. Id. at 584, 95 S.Ct. at 741, 42 L.Ed.2d at 740.
In New Jersey, authority to expel a student from a public school is granted by statute. See N.J.S.A. 18A:37-1 and -2. In Tibbs v. Board of Educ. of Franklin Tp., 114 N.J.Super. 287, 276 A.2d 165 (App. Div.), aff'd o.b., 59 N.J. 506, 284 A.2d 179 (1971), our Supreme Court held that, when facing expulsion, a public school student has the right to discover the names of witnesses against him or her, and to obtain copies of statements or affidavits of the adverse witnesses. In addition, the student has the right to have the witnesses appear in person for questioning; if the witness fails to appear for questioning, then their statements may not be relied on as a basis for suspension or expulsion for misconduct. Id. at 300, 276 A.2d 165.
Public high schools may immediately and temporarily suspend a student for a short period if school officials have reason to believe that the student is a danger to himself, others, or school property, pending a full hearing complete with procedural due process. R.R. v. Board of Educ., Shore Regional High School, 109 N.J.Super. 337, 347-48, 263 A.2d 180 (Ch. Div.1970). However, the school must first give the student a preliminary hearing for the temporary suspension, either prior to the temporary suspension or at a reasonable time thereafter. The preliminary hearing may be informal, but the "student should be given the opportunity to persuade the authority that there is a case of mistaken identity or that there is some other compelling reason why he [or she] should not be suspended pending a full hearing." Id. at 348, 263 A.2d 180. The nature of the subsequent full hearing, if one is held, "clearly depends upon the circumstances of the particular case." Ibid. (citations omitted).
In G.F. v. Board of Educ., Washington Tp., 1 N.J.A.R. 55 (1979), an Administrative Law Judge determined that when a public school student faces expulsion or long-term suspension, the school board must advise the student, in writing, of: the charges; the list of witnesses to be called *374 to support each charge; the right to cross-examine the witnesses; the right to enter their own defense; and the right to counsel. Id. at 65. However, the right to counsel is only a "right to employ counsel"; the student "need not be represented by counsel." R.R., supra, 109 N.J.Super. at 349, 263 A.2d 180; see also J.A. v. South Orange Board of Educ., 318 N.J.Super. 512, 524, 723 A.2d 1270 (App.Div.1999) (extending due process protections to prospective public school students).
Public universities afford constitutional due process in disciplining students; however, when the student requests protections from the law of contracts rather than the law of procedural due process, New Jersey courts have declined to characterize the relationship between student and university as contractual. In Mittra v. University of Medicine, 316 N.J.Super. 83, 719 A.2d 693 (App.Div.1998), plaintiff was a student who was dismissed from a state university for academic reasons. Plaintiff filed a complaint alleging the student handbook formed contractual obligations which the school breached. We cited Napolitano, supra, 186 N.J.Super. 548, 453 A.2d 263, rejecting the "rigid application of contractual principles to university-student conflicts involving academic performance," and instead limited the "scope of review to a determination whether the procedures followed were in accordance with the institution's rules and regulations." Mittra, supra, 316 N.J.Super. at 90, 719 A.2d 693. Thus, we found that the public university fairly followed its own regulations in expelling the plaintiff for academic reasons. Id. at 92, 719 A.2d 693. We also noted that the student was protected by due process. Id. at 91-92, 719 A.2d 693; see also Sill v. Pennsylvania State Univ., 462 F.2d 463 (3d Cir.1972) (holding that disciplinary infractions at a state university required adequate notice and an opportunity to be heard; this was satisfied when the board of trustees appointed a disciplinary panel to make findings of facts and disciplinary recommendations to the president when notice and a hearing were also supplied to the student).
A private primary or secondary school is generally considered a private association rather than a function of the state. The procedural rights inherent in membership with a private association, and the termination of that membership, are substantially less than those of a public school or public university student. Membership in a private organization attaches somewhat different rights than "membership" in a private university. We find, however, that membership in a private high school is distinguishable from membership in other private associations.
Membership in a private organization receives the least procedural protection in our judiciary. The court must first balance the conflicting interests of the association's autonomy and the member's interest in the association; then, the court will only interfere when the association unfairly neglects to follow its established procedures for discipline. In Rutledge v. Gulian, 93 N.J. 113, 459 A.2d 680 (1983), the plaintiff was disciplined by the Society of Free and Accepted Masons of New Jersey of which he was a member. The Court faced the issue of whether membership in a private organization warrants judicial protection. The Court first determined that membership in a fraternal organization warrants "protection from unreasonable discomfiture" by virtue of the status it confers on its members. Id. at 119, 459 A.2d 680. The Court then concluded that
[i]n determining whether a private organization is bound by its established procedures, we would again balance the organization's interest in autonomy and its reason for straying from its rules against the magnitude of interference with the member's interest in the organization and the likelihood that the established procedures would safeguard that interest.
[Id. at 123, 459 A.2d 680.]
*375 The Court further noted that "a private organization has a great interest in controlling its own affairs." Ibid. Thus, "judicial intrusion should be confined to procedures that are fundamentally unfair." Id. at 124, 459 A.2d 680. The Court found no reason to intervene with the Mason's decision to discipline plaintiff. Ibid.
The judiciary may similarly intervene in a church's decision to expel its members so long as the review does not require the court to interpret religious doctrine. Baugh v. Thomas, 56 N.J. 203, 265 A.2d 675 (1970).
Private university students enjoy greater procedural rights because of the unique relationship between the university and its students. As such, a private university may expel a student only upon a showing of sufficient evidence. In Napolitano, supra, 186 N.J.Super. 548, 453 A.2d 263, plaintiff was charged by Princeton, a private university, with plagiarism, tried in front of the Committee on Discipline, and found guilty. Thus, Princeton withheld the student's diploma for one year as punishment. On appeal, we determined first that the issue was the propriety of discipline involving academic fraud, rather than general misconduct. Id. at 563, 453 A.2d 263; see also Board of Curators, Univ. of Mo. v. Horowitz, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (distinguishing academic dismissal from dismissal for misconduct). We declined to apply the law of private associations to a private university setting, as the relationship between a student and a private university is unique, not purely contractual or associational. Napolitano, supra, 186 N.J.Super. at 565-66, 453 A.2d 263. We concluded that the trial court properly reviewed the Committee decision and determined that the "evidence presented was sufficient to support the charge of plagiarism." Id. at 570, 453 A.2d 263; see also Clayton v. Princeton Univ., 608 F.Supp. 413, 438 (D.N.J.1985) (interpreting New Jersey law and holding that when a private university has adopted a regulation establishing the procedure for expulsion for misconduct, then the university must follow that procedure).
Although no court in New Jersey has addressed the procedural requirements of a private high school for disciplinary expulsion, other state courts have addressed this issue. In Flint v. St. Augustine High School, 323 So.2d 229 (La.Ct.App.1975), writ refused, 325 So.2d 271 (La.1976), two students were expelled from St. Augustine High, a private Catholic high school, for smoking, a violation of the code of conduct delineated in the handbook. In discussing due process claims, the appellate court held that constitutional due process was not invoked by a private high school. The court stated that
private institutions like St. Augustine High School have a near absolute right and power to control their own internal disciplinary procedure which, by its very nature, includes the right and power to dismiss students. That is not to say that due process safeguards can be cavalierly ignored or disregarded. But, if there is color of due processthat is enough.
[Id. at 234.]
The appellate court determined that the school provided sufficient notice to the student to satisfy the "color of due process" requirement.
We agree that "due process safeguards can [not] be cavalierly ignored or disregarded." Ibid. However, we decline to hold that the rights of a private high school student are the same as those of a private university student, because we find a distinction between the two institutions. A student at a private university, if expelled during the semester for misconduct, loses academic credit for the entire semester. Further, the university student must complete applications for admission to another university in order to complete the expected degree. An expelled student in a private high school, on the other hand, may transfer immediately to the local public high school. The high school student will not lose credit for the semester; rather, *376 the student may complete the semester at the public school, and receive a high school diploma from the public school. See Oefelein, supra, 353 N.Y.S.2d at 675 ("A high school student has immediate access to the public schools to complete his [or her] education. A college student may not be able to transfer so easily."). As such, the procedural rights of a private university student will be more aggressively protected by the courts when compared to the procedural rights of an expelled student at a private high school.
We hold that a private high school, when expelling a student for misconduct, must follow a two-prong process. First, the private high school must adhere to its own established procedures for dismissal. Second, in executing the dismissal, the school must follow a procedure that is fundamentally fair.
Here, Don Bosco's student handbook set forth the procedure for expulsion. The Discipline Committee must meet; then the Committee must make a recommendation to the Principal regarding dismissal; afterwards, the Principal consults with the Director. The student may appeal the decision to the Director. The evidence in the record on appeal clearly shows that Don Bosco followed this procedure before dismissing plaintiff.
Plaintiff argues that Don Bosco failed to follow its own procedure by failing to notify the Ramsey police of his alleged sale and distribution of steroids. The student handbook states that the investigation of use, sale, or distribution of legal or illegal drugs "will be handled by the Ramsey Police Department." Although Don Bosco alerted its students that it would involve the Ramsey police in instances involving the "use, sale, or distribution of alcohol or drugs, whether legal or illegal," we do not consider its failure to do so as depriving a student of a procedural right. In fact, plaintiff derived a benefit from Don Bosco's failure to contact the police because he avoided interrogation and possible criminal or juvenile charges if the steroids were in fact illegal. Plaintiff can not now claim that the failure to contact the police violated his procedural rights.
Whether the procedure is fundamentally fair will depend on the circumstances of the expulsion. Here, plaintiff was notified of the charges of trashing the teacher's home and prank calling the same teacher. He was notified of the charges of steroid use and distribution at the meeting with O'Sullivan at which time he was suspended indefinitely. Plaintiff took the opportunity to appeal to Father Grinsell, the Director. Additionally, plaintiff had the opportunity to defend the charges, and did so by taking a polygraph test and a drug test. His appeal to Father Grinsell was denied, and the test results did not affect the decision to expel plaintiff. We consider this procedure to be fundamentally fair.
Accordingly, we reverse the order denying Don Bosco's summary judgment, see Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995), and dismiss the complaint against Don Bosco with prejudice.
NOTES
[1] This opinion will refer only to defendant Don Bosco and to plaintiff Marcus Hernandez.
[2] Plaintiff's complaint alleged that defendants: breached their legal and contractual obligation to provide plaintiff with a thorough and proper high school education (counts one and three); violated due process by dismissing plaintiff from defendant school without notice and an opportunity to be heard (counts two, four, six, and seven); committed "improper actions and violations of right" which caused financial, educational, physical and emotional damage, pain, and suffering (count five); and committed slander (count eight). The complaint sought punitive and compensatory damages for damage to his educational future and opportunities. The motion judge granted summary judgment on count eight, but denied summary judgment on counts one to seven.
[3] The Don Bosco Student & Parent Handbook provides that detentions are given only in "extreme cases."
[4] Marc was near the end of his senior year when he was dismissed. He transferred to Ramapo High School in New City, New York, but attended classes for only three weeks because he was not "ready to go to school" and not "feeling up to going to college" because he was "distressed." He ultimately graduated from Clarkstown Senior North High School. In 1996, he entered Bucknell University.
[5] Assistant Principal O'Sullivan signed the probation letter that was sent to Marc in the summer of 1994. The principal at that time, Father John Connolly, was leaving the office that summer, and the new principal, Dr. John Scanlon, was taking the office. The Assistant Principal was "the link between the two principals."